KCS
060420
1210

| | |
|---|---|
| **DISTRICT COURT, DOUGLAS COUNTY, STATE OF COLORADO**<br>Court Address:<br>4000 Justice Way<br>Castle Rock, CO 80109 | DATE FILED: June 3, 2020 12:33 PM<br>FILING ID: 97756726A6BEE<br>CASE NUMBER: 2020CV30425 |
| **Plaintiff:**<br><br>BOULDER REAL ESTATE COMPANY, LLC, a Colorado limited liability company<br><br>v.<br><br>**Defendant:**<br><br>MATTRESS FIRM, INC., a Delaware corporation | **▲ COURT USE ONLY ▲** |
| **Attorneys for Plaintiff:**<br>Attorney:    Alan D. Sweetbaum, #13491<br><br>Name:       Sweetbaum Sands Anderson PC<br>Address:    1125 17th Street, Suite 2100<br>               Denver, Colorado 80202<br>Phone No.:  (303) 296-3377<br>Fax No.:    (303) 296-7343<br>E-mail:     asweetbaum@sweetbaumsands.com | Case No.: 2020CV030425<br>Division/Ctrm: 5 |
| **SUMMONS IN FORCIBLE ENTRY AND UNLAWFUL DETAINER** | |

## THE PEOPLE OF THE STATE OF COLORADO, TO THE ABOVE-NAMED DEFENDANT:

You are hereby commanded to contact the Douglas County District Court by telephone at 720-437-6180, Meeting No. 75578# on **Friday, June 12, 2020 at 9:00 a.m.** to answer the Complaint of the Plaintiff attached hereto, that you, the Defendant, are unlawfully in possession of the property described in the Complaint.

If you fail to file with the Court, at or before the time for appearance specified in the Summons, an answer to the Complaint setting forth the grounds upon which you base your claim for possession and denying or admitting all of the material allegations of the Complaint, judgment by default may be taken against you for the possession of the property described in the Complaint, for the rent, if any, due or to become due, for the present and future damages and

costs, and for any other relief to which the Plaintiff is entitled. If you are claiming that the landlord's failure to repair the residential premises is a defense to the landlord's allegation of nonpayment of rent, the court will require you to pay into the registry of the court, at the time of filing your answer, the rent due less any expenses you have incurred based upon the landlord's failure to repair the residential premises.

Dated this 3rd day of June, 2020.

Respectfully submitted,
SWEETBAUM SANDS ANDERSON PC

By: *S/Alan D. Sweetbaum*
Alan D. Sweetbaum
*Attorneys for Plaintiff*

**This Summons Is Issued Pursuant To C.R.C.P. 4, As Amended, And Section 13-40-111, C.R.S. A Copy Of The Complaint Must Be Served With This Summons.**

<table>
<tr><td>

DISTRICT COURT, DOUGLAS COUNTY, STATE OF COLORADO
Court Address:
4000 Justice Way
Castle Rock, CO 80109

</td><td>

DATE FILED: June 2, 2020 3:19 PM
FILING ID: 5C6353F238B1E
CASE NUMBER: 2020CV30425

</td></tr>
</table>

| DISTRICT COURT, DOUGLAS COUNTY, STATE OF COLORADO Court Address: 4000 Justice Way Castle Rock, CO 80109 | DATE FILED: June 2, 2020 3:19 PM FILING ID: 5C6353F238B1E CASE NUMBER: 2020CV30425 |
|---|---|
| **Plaintiff:** BOULDER REAL ESTATE COMPANY, LLC, a Colorado limited liability company v. **Defendant:** MATTRESS FIRM, INC., a Delaware corporation | **▲ COURT USE ONLY ▲** |
| **Attorneys for Plaintiff:** Attorney: Alan D. Sweetbaum, #13491 Name: Sweetbaum Sands Anderson PC Address: 1125 17th Street, Suite 2100 Denver, Colorado 80202 Phone No.: (303) 296-3377 Fax No.: (303) 296-7343 E-mail: asweetbaum@sweetbaumsands.com | Case No.: Division/Ctrm: |
| **COMPLAINT (UNLAWFUL DETAINER)** | |

Plaintiff, Boulder Real Estate Company, LLC, ("Boulder"), through its counsel, Sweetbaum Sands Anderson PC, for its Complaint against Defendants, states and alleges as follows:

## GENERAL ALLEGATIONS

1. Boulder is a Colorado limited liability company and owns real property located at 18220 Cottonwood Drive, Parker, CO 80138 (the "Property").

2. Mattress Firm, Inc. ("Mattress Firm") is a Delaware corporation doing business in the State of Colorado with a Registered Agent of CT Corporation System, 7700 E. Arapahoe Rd., Ste. 220, Centennial, CO 80112-1268.

3.     Venue is proper in the County of Douglas pursuant to C.R.C.P. 98 because the property which is the subject of this lawsuit is located in the County of Douglas.

4.     Crown Point RC, LLC, an Arizona limited liability company, as landlord, and Mattress Firm, as tenant, entered into a lease ("Lease") dated April 2, 2018 for the Property. A copy of the Lease is attached hereto and incorporated herein by reference as **Exhibit A.**

5.     The landlord's interest under the Lease was subsequently assigned to Boulder.

6.     Rental payments due under the Lease commenced on November 20, 2018 and the Lease will expire on November 30, 2028.

7.     The Lease generally provides for payment of rent and additional rent on a monthly basis.  The Lease further provides that the failure to pay rent is an event of default which default entitles the landlord to recover past due rent, accelerated rent, costs of reletting and costs of enforcement of the lease including, but not limited to, attorney's fees and costs.

8.     Mattress Firm has failed to pay rent and additional rent under the Lease.

9.     Mattress Firm is in default under the Lease.

## FIRST CLAIM FOR RELIEF
### (Possession)

10.     Boulder incorporates Paragraph 1 through 9 above as though fully set forth herein.

11.     Boulder properly served a written Demand for Payment of Rent or Possession of Premises ("Demand") pursuant to C.R.S. § 13-40-104(e) by posting a true and correct copy in a conspicuous place on the Property on May 14, 2020. A copy of the Demand is attached hereto and incorporated herein by reference as **Exhibit B.**  A copy of the Affidavit of Service indicating service by posting is attached hereto and incorporated herein by reference as **Exhibit C.**

12.     Mattress Firm has failed and refused to comply with the Demand within the period of time specified therein.

13.     In fact, Mattress Firm refused to respond to Boulder's reasonable requests for financial information regarding why rent has not been paid or when Mattress Firm expects to open for business.

14.     Mattress Firm unlawfully and wrongfully holds possession of the Property without the consent of Boulder.

15.   Boulder is entitled to an Order for Possession of the Property with a Writ of Restitution to be issued 48 hours thereafter.

**SECOND CLAIM FOR RELIEF**
**(Breach of Lease)**

16.   Boulder incorporates Paragraphs 1 through 15 above as though fully set forth herein.

17.   Based on the breach of Lease, Boulder is entitled to recover from Mattress Firm all damages including, but not limited to, past due rent, additional rent, accelerated rent, late fees, interest, attorney's fees and costs associated with, but not limited to, enforcement of tenant's obligations under the Lease.

WHEREFORE, Plaintiff requests that judgment enter in its favor as follows:

(a) For an Order for Possession of the Property with a Writ of Restitution to be issued 48 hours thereafter;

(b) Against Mattress Firm for damages including, but not limited to, past due rent, additional rent and accelerated rent under the Lease;

(c) Against Mattress Firm for pre and post judgment interest at the highest rate permitted;

(d) Against Mattress Firm for attorneys' fees and costs incurred in prosecuting this action;

(e) For such other and further relief as the Court deems just and proper.

Respectfully submitted,
SWEETBAUM SANDS ANDERSON PC


By: *S/Alan D. Sweetbaum*
Alan D. Sweetbaum
*Attorneys for Plaintiff*

Plaintiff's Address:
Boulder Real Estate Company, LLC
1528 Wazee Street
Denver, CO 80202

DATE FILED: June 2, 2020 3:19 PM
FILING ID: 5C6353F238B1E
CASE NUMBER: 2020CV30425

# LEASE

between

## CROWN POINT RC, LLC

and

## MATTRESS FIRM, INC.

18220 Cottonwood Drive

Parker, Colorado 80138

**EXHIBIT A**

| LEASE YEAR(s) | BASE RENT (ANNUAL) | | BASE RENT (MONTHLY) |
| --- | --- | --- | --- |
| | PER SQUARE FOOT OF PREMISES FLOOR AREA | TOTAL | |
| 1 – 5 | $38.00 | $132,772.00 | $11,064.33 |
| 6 – 10 | $41.80 | $146,049.20 | $12,170.77 |
| 1st Extension Period 11 – 15 | $45.98 | $160,654.12 | $13,387.84 |
| 2nd Extension Period 16 – 20 | $50.58 | $176,726.52 | $14,727.21 |

(h)     "Permitted Use": the retail sale of bedding products, including mattresses, waterbeds, futons, box springs, foundations, bed frames, headboards, pillows, comforters, and other related merchandise ("Principal Use"). In addition, Tenant shall be permitted to (i) use portions of the Premises for storage and office uses incidental to the Principal Use, and (ii) subject to any exclusive use provision or prohibited use restriction granted to any other tenant or occupant of adjacent property and in effect on the Effective Date, use all or any portions of the Premises for any other lawful retail use.

(i)     "Tenant's Property": all of Tenant's fixtures, furnishings, equipment, stock-in-trade, leasehold improvements, or personal property of any kind owned by or placed in, upon, or about the Premises by Tenant, its agents, contractors or employees, during the Term.

(j)     "Exterior Areas": all sidewalks, access roads, driveways, parking areas, alleys, service areas including loading and unloading facilities and landscaping, if any, of the Property.

(k)     "Addresses for Rent and Notices":

To Landlord:     Crown Point RC, LLC
                 4729 E Sunrise Drive, #464
                 Tucson, AZ 85718
                 Attention:  Adam Karnu

With a copy of notices, if any, to:

                 Crown Point RC, LLC
                 5910 S. University Blvd., #C-18
                 Greenwood Village, Colorado 80121
                 Attention:  Steve Stannell

2

**EXHIBIT A**

To Tenant:        Mattress Firm, Inc. (Store #_____ )
                    10201 South Main Street
                    Houston, Texas 77025
                    Attention: Real Estate Department

With a copy of default notices, if any, to:

                    Mattress Firm, Inc. (Store #_____ )
                    10201 South Main Street
                    Houston, Texas 77025
                    Attention: Lease Administration

(f) "Address for Rent Statements": for monthly rent statements or invoices, real estate tax and insurance bills and reconciliations, monthly property payables and the like.

To Tenant:        Mattress Firm, Inc. (Store #_____ )
                    10201 South Main Street
                    Houston, Texas 77025
                    Attention: Lease Administration

Section 1.2.   Granting of the Premises.  In consideration of the rents agreed to be paid and of the covenants and agreements made by the respective parties hereto, Landlord demises and leases to Tenant and Tenant hereby leases from Landlord the Premises, subject to the terms and conditions of this Lease.

Section 1.3.   Floor Area.  The term "gross leasable floor area" as used in this Lease shall mean the actual number of square feet of space contained within the Premises.  All measurements for purposes of calculating gross leasable floor area shall be from the exterior of outside walls or storefront.  Upon substantial completion of Landlord's Work (as hereinafter defined), Tenant, at its cost and expense, may have a licensed architect or engineer verify Landlord's square footage as defined in Section 1.1(b), and if Tenant's architect/engineer does not agree with Landlord's determination of the gross leasable floor area of the Premises (3,494 square feet), and after good faith negotiations between Landlord and Tenant, the parties are unable to come to an agreed square footage, Landlord and Tenant shall promptly select a third party architect or engineer licensed in the State of Colorado, whose determination of the gross leasable floor area of the Premises (which shall be between the two square footage numbers calculated by Landlord and Tenant's architect/engineer) shall be final and binding on the parties.  The reasonable costs, fees, and expenses of the third party architect/engineer shall be borne equally by the two parties.  If the final determined gross leasable floor area of the Premises shall vary from the estimated square footage set forth in Section 1.1(b) above, all charges and payments calculated with reference to the gross leasable floor area of the Premises shall be recalculated in order to reflect the actual gross leasable floor area of the Premises, determined in accordance herewith.  Notwithstanding the foregoing, in the event the gross leasable floor area of the Premises (as determined in accordance with the provisions of this Section 1.3) exceeds the gross leasable floor area of the Premises set forth in Section 1.1(b) above, the Base Rent and all Additional Rent (as hereinafter defined) shall not increase over such charges that would be payable based upon the gross leasable floor area of the Premises set forth in Section 1.1(b).  If the actual gross leasable floor area of the Premises (as

3

**EXHIBIT A**

determined in accordance with the provisions of this Section 1.3) is below 3,100 square feet, Tenant may terminate this Lease, whereupon neither party shall have any further right or remedy against the other.

Section 1.4. Quiet Enjoyment. Landlord covenants that so long as Tenant is not in default beyond all applicable cure periods provided hereunder, Tenant shall peaceably and quietly have, hold and enjoy the Premises and Property during the Term, without hindrance, ejection or molestation by any person. Following the Turn Over Date and throughout the Term of this Lease, in no event shall Landlord alter the exterior façade of the Premises without the prior written consent of Tenant, which Tenant may grant or withhold in its sole discretion.

Section 1.5. Rent Commencement Date. Except as herein provided to the contrary, the phrase "Rent Commencement Date" shall mean the date which is the earlier of: (a) the date Tenant opens for business at the Premises; or (b) ninety (90) calendar days following the later of (i) the Turn Over Date (as hereinafter defined), or (ii) the date upon which Tenant secures final and irrevocable building permits necessary for the performance and completion of Tenant's Work (as hereinafter defined) and any licenses, permits or approvals necessary for the installation of Tenant's signage and Tenant's use of the Premises for the Permitted Use, in each case without conditions unacceptable to Tenant (collectively, "Tenant's Permits"). For purposes of the preceding sentence, the ninety (90) day period provided for therein shall be extended by the number of days of delay, if any, in Tenant's completion of Tenant's Work and ability to open the Premises for business which is reasonably attributable to any casualty or condemnation event occurring prior to the expiration of said ninety (90) day period. For purposes of this Lease, the term "Turn Over Date" shall mean, subject to the terms of this Section 1.5, the date that Landlord delivers possession of the Premises to Tenant with Landlord's Work "substantially complete". In order for Landlord's Work to be deemed "substantially complete", the remaining uncompleted portion (if any) of Landlord's Work shall be minor details of construction of such nature that the performance thereof will not interfere with the performance of Tenant's Work and/or the ability of Tenant to lawfully open for business to the public in the Premises (the "Punch List Items"). Landlord and Tenant shall meet at the Premises at a mutually acceptable date and time on or prior to the Turn Over Date to conduct an on-site inspection of Landlord's Work and to prepare a punch list setting forth the Punch List Items. All Punch List Items shall be diligently pursued by Landlord to completion and in any event shall be completed by Landlord within thirty (30) days after the Turn Over Date. Landlord shall give Tenant at least thirty (30) days' prior written notice of the Turn Over Date, and in no event shall the Turn Over Date be deemed to have occurred if any of the following are not fully satisfied:

(a) the Building, Premises and Exterior Areas shall be in the condition as set forth in this Lease and Landlord's Plans (as defined in Section 3.1 below);

(b) Tenant has received copies of any and all third party consents and approvals provided for in Article III and Section 4.6 below; and

(c) The Access Drives and Monument Sign as required under Section 3.2 and Section 4.5 hereof are constructed and available for use by Tenant, and Tenant has received a copy of the recorded Access Easement as required under Section 3.2.

-4-

**EXHIBIT A**

In the event the Turn Over Date shall not have occurred by October 1, 2018 (the "Target Date"), then Tenant shall receive two (2) days of free Base Rent and Additional Rent for every day that the Turn Over Date is delayed after the Target Date. If the Turn Over Date shall not have occurred by November 1, 2018 (the "Outside Delivery Date"), Tenant shall have the additional right to terminate this Lease by written notice given to Landlord at any time prior to the Turn Over Date; however, such termination right is in addition to, and not in lieu of, Tenant's right to continue to accrue free Base Rent and Additional Rent days as aforesaid. The Outside Delivery Date may not be extended by Force Majeure (as defined in Section 11.6 hereof, or otherwise) beyond February 1, 2019, and shall not be extended for any other reason, without the prior written consent of Tenant (which consent may be withheld in Tenant's sole, unfettered discretion, and if granted, shall be documented in the form of an amendment to this Lease signed by both parties). Additionally, and notwithstanding anything herein to the contrary, the Turn Over Date shall not occur prior to the Target Date. Within ten (10) days of the Turn Over Date, the parties, shall confirm the Turn Over Date by completing, executing, and exchanging fully executed originals of the form of Confirmation of Turn Over Date attached hereto as Exhibit "G" and made a part hereof.

The parties shall confirm the Rent Commencement Date in writing, by completing, executing, and exchanging fully executed originals of the form of Confirmation Agreement, attached hereto as Exhibit "F", and made a part hereof.

**ARTICLE II:**
**RENT AND OTHER CHARGES**

**Section 2.1.   Base Rent.** From and after the Rent Commencement Date and throughout the Term, Tenant shall pay to Landlord without previous demand therefor and without any setoff or deduction whatsoever, except as specifically provided in this Lease, the Base Rent set forth in Section 1.1(g), in equal monthly installments, in advance, on the first day of each calendar month throughout the Term; provided, however, the first rental payment date hereunder shall occur on the Rent Commencement Date. If the Rent Commencement Date occurs on a day other than the first day of a calendar month, or if the last day of the Term occurs on a day other than the last day of a calendar month, Base Rent and Additional Rent for such fractional month(s) shall be prorated on a per diem basis.

**Section 2.2.   Taxes.** From and after the Rent Commencement Date and throughout the Term, Tenant shall pay promptly when due all taxes imposed upon Tenant's Property, and shall pay to Landlord, as Additional Rent, all Real Estate Taxes (as hereinafter defined) charged against the Property during the Term, prorated for any tax years falling only partially within the Term.

(a)   The term "Real Estate Taxes" shall mean all taxes and assessments (special or otherwise) levied or assessed against the Property, and other taxes arising out of the use and/or occupancy of the Property, imposed by federal, state or local governmental authority or any other taxing authority having jurisdiction over the Property. Nothing contained in this Lease, however, shall be deemed or construed to include within the definition of Real Estate Taxes, and Tenant shall not be responsible for: (i) any transfer, documentary or stamp tax; (ii) any tax upon the income, profits or business, including any tax assessed as an income tax accounted for under ASC 740, of Landlord or other parties other than Tenant; (iii) any tax in the nature of a "rents tax" or

2

**EXHIBIT A**

business margins tax assessed against Landlord or the Property: (iv) any personal property taxes, payroll taxes, capital levy, gross receipts or franchise taxes or inheritance or estate taxes, even though such taxes may become a lien against the Property; (v) any fine, penalty, cost or interest for any tax or assessment, or part thereof, which Landlord or its lender failed to timely pay; or (vi) impact fees.

(b)     Landlord shall estimate the Real Estate Taxes and Tenant shall pay Landlord one-twelfth (1/12th) thereof monthly in advance, together with the payment of Base Rent. The estimated annual Real Estate Taxes for the first (1st) Lease Year are $4.00 per square foot of the gross leasable floor area of the Premises per year, amounting to estimated aggregate Real Estate Taxes of $13,976.00, of which Tenant shall pay $1,164.67 to Landlord on a monthly basis. Landlord shall pay all Real Estate Taxes to the appropriate taxing authorities when due. Promptly following the end of each Lease Year, Landlord shall deliver to Tenant a written statement of the actual Real Estate Taxes, which statement shall include a copy of all relevant tax bills from which the actual Real Estate Taxes were determined, and there shall be a reconciliation between Landlord and Tenant, with payment to or repayment by Landlord, if and as the case may require, such that Landlord shall only receive the actual Real Estate Taxes for such period, and if Tenant is owed any repayment by Landlord, Tenant shall be entitled to credit any such overpayment against the next due installments of Rent (as hereinafter defined) under this Lease or receive a refund of such amounts within thirty (30) days if no such further payment of Rent is due. Landlord shall be permitted, but no more than once per Lease Year, to adjust the estimated Real Estate Taxes, if in Landlord's good faith determination such adjustment is necessary to minimize or obviate the need for an annual reconciliation between Landlord and Tenant. The terms of this Section 2.2(b) shall survive the expiration or termination of this Lease.

(c)     If Landlord contests Real Estate Taxes and the result of any such contest shall be a reduction in the amount of such Real Estate Taxes so contested, the refund or recovery of Real Estate Taxes shall belong to Tenant, net of the cost incurred by Landlord in contesting such Real Estate Taxes. If Landlord shall fail or refuse, upon the reasonable request of Tenant, to take any necessary steps to contest the validity or amount of Real Estate Taxes for any real estate fiscal tax year, Tenant may undertake such contest, by appropriate proceedings in the name of Landlord; provided that Tenant holds Landlord harmless from and costs, expenses and liabilities, (other than the actual Real Estate Taxes) related thereto. Within a reasonable time after demand therefor, Landlord shall execute and deliver to Tenant any reasonable documents required to enable Tenant to prosecute any such proceeding. Landlord shall use reasonable efforts to inform Tenant, in time to permit Tenant to undertake such contest, of all pertinent data in Landlord's possession required to undertake such contest, provided Tenant makes a reasonable advance written request to Landlord therefor.

Section 2.3.   Insurance Charges.   From and after the Rent Commencement Date and continuing throughout the Term, Tenant shall reimburse Landlord, as Additional Rent, the premiums paid by Landlord for Landlord's Insurance (as defined in Section 5.5) during the Term (the "Insurance Charges"), prorated for any coverage periods falling only partially within the Term. Landlord shall estimate the annual Insurance Charges and Tenant shall pay Landlord one-twelfth (1/12th) thereof monthly in advance, together with the payment of Base Rent.  The estimated Insurance Charges for the first (1st) Lease Year are $0.50 per square foot of the gross leasable floor area of the Premises per year, amounting to estimated aggregate Insurance Charges

**EXHIBIT A**

of $1,747.00, of which Tenant shall pay $145.58 to Landlord on a monthly basis. Promptly following the end of each Lease Year, Landlord shall deliver to Tenant a written statement of the actual Insurance Charges, which statement shall include a copy of all relevant statements from which the actual Insurance Charges were determined, and there shall be a reconciliation between Landlord and Tenant, with payment to or repayment by Landlord, if and as the case may require, such that Landlord shall only receive the actual Insurance Charges for such period and if Tenant is owed any repayment by Landlord. Tenant shall be entitled to credit any such overpayment against the next due installments of Rent under this Lease or receive a refund of such amounts within thirty (30) days if no such further payment of Rent is due. Landlord shall be permitted, but no more than once per Lease Year, to adjust the estimated Insurance Charges, if in Landlord's good faith determination such adjustment is necessary to minimize or obviate the need for an annual reconciliation between Landlord and Tenant. The terms of this Section 2.3 shall survive the expiration or termination of this Lease.

Section 2.4. Utilities Charges; Trash Removal. From and after the Rent Commencement Date and continuing throughout the Term, Tenant shall pay for all of its consumption of utilities at the Premises, including, but not limited to, gas, water, electricity, sewer charges, and the like, including all utilities necessary for heating and air conditioning the Premises. Landlord shall not be liable to Tenant for any loss, damage or expense which Tenant may sustain if the utilities, or the quality or character of utilities, used upon or furnished to the Premises are no longer available or suitable for Tenant's requirements, or if the supply of any such utility ceases or is interrupted as a result of any cause and no such change, interruption or cessation of service shall constitute an eviction of Tenant; provided, however, if a stoppage or interruption of utility service was caused solely by the gross negligence or willful misconduct of Landlord or its agents, employees or contractors, then Tenant shall have all remedies at law or in equity, and, in addition, if such stoppage or interruption causes Tenant to be unable to operate its business at the Premises for more than seventy-two (72) consecutive hours, Base Rent shall abate until Tenant's use of the Premises is restored. Landlord shall provide an area to locate a trash container and recycling bins on the Property for trash disposal for Tenant's use. Tenant shall be responsible to subscribe and pay for all trash disposal services for the Property.

Section 2.5. Definition of Rent and Additional Rent. The term "Rent" shall mean all Base Rent and Additional Rent. "Additional Rent" shall mean Real Estate Taxes, Insurance Charges and all other payments (other than Base Rent) required to be paid by Tenant to Landlord under this Lease.

## ARTICLE III.
## CONSTRUCTION; ACCESS EASEMENT

Section 3.1. Construction. The Building, Premises and Exterior Areas shall be constructed by Landlord in accordance with plans bearing final revision date of June 9, 2017 and provided to Tenant by Landlord on February 23, 2018, entitled Crown Point Retail – Core & Shell Construction Documents, prepared by ArcWest Architects and consisting of 25 sheets more particularly identified on Exhibit "C-1" attached hereto and made a part hereof, which Landlord has indicated were approved by the Town of Parker on 07/05/2017 (herein referred to as the "Landlord's Plans" and by this reference incorporated herein) (collectively the "Landlord's Work"); and Tenant shall improve the Premises in accordance with the provisions of Exhibit "C-

7

**EXHIBIT A**

2" annexed hereto and made a part hereof (the "Tenant's Work"). Following the complete execution of this Lease, Landlord shall, with all due diligence but subject to events and circumstances beyond Landlord's reasonable control, at Landlord's sole expense and in compliance with this Article III, complete Landlord's Work. Subject to events and circumstances beyond Landlord's reasonable control, prior to the Turn Over Date, Landlord shall obtain all necessary governmental and/or third-party approvals for Landlord's Work and the Monument Sign and shall have completed all Exterior Areas and access ways necessary for Tenant to obtain a certificate of occupancy for the Premises following the completion of Tenant's Work. Landlord shall be responsible for the payment of any impact fees, hook-up/tap fees (if any) and permits that are applicable to Landlord's Work and shall cooperate with Tenant's efforts to obtain Tenant's Permits including, when required by the permitting authority, and promptly upon Tenant's request, executing application paperwork. Tenant shall make application for permits applicable to Tenant's Work on or before 60 days following the Effective Date of this Lease.

Section 3.2.   Access Drives. Prior to the Turn Over Date, Landlord shall obtain and furnish Tenant reasonable evidence of any and all needed easements for vehicular and pedestrian ingress and egress over the Access Drives (hereinafter defined) so as to provide ingress and egress between the Property and Cottonwood Drive by the owner and tenants of the Property and their employees, customers and invitees (from the owner(s) of the easement property and including the joinder of any easement property lienholders for the purpose of subordinating their liens to the easement), properly recorded (collectively, the "Access Easement"). The "Access Drives", for purposes of this Lease, mean those portions of the drive lanes serving or to serve the Property which are so identified on the attached Site Plan, to the extent not publicly dedicated and maintained.

## ARTICLE IV.
## USE OF THE PREMISES

Section 4.1.   Use of Premises. Tenant agrees to use the Premises only for the Permitted Use and for no other purpose. Tenant covenants that the Premises shall, during the Term of this Lease, be used only and exclusively for lawful purposes; and no part of the Premises, Property or improvements thereon shall be used in any manner whatsoever for any purposes in violation of the laws, ordinances, regulations or orders of the United States, or of the State, County and/or City, wherein the Premises is located. Tenant shall comply with all such laws, ordinances, regulations or codes now in effect or hereafter enacted or passed during the Term of this Lease insofar as the Premises and any signs of Tenant are concerned, including, but not limited to, zoning ordinances, building codes and fire codes; provided, however, Tenant shall not be required to make structural alterations to the Premises, Building or Property unless made necessary solely by reason of the nature of Tenant's Business (i.e., the specific nature of such business, as opposed to retail use generally) or alterations performed in the Premises by Tenant pursuant to Article VII below. Notwithstanding the foregoing, Landlord covenants, represents and warrants that, upon the Turn Over Date, the Property, Building and Premises and all parts thereof shall be in substantial compliance with applicable laws, codes, ordinances and regulations of all federal, state, county and municipal authorities, including Title III of the Americans With Disabilities Act of 1990 (as same may have been amended), any regulations promulgated thereunder, and any applicable restrictive covenants; and Landlord shall be obligated at Landlord's cost to maintain same in compliance with all applicable laws, codes and ordinances throughout the Term of this Lease.

8.

## EXHIBIT A

except to the extent of any non-compliance of the interior of the Premises caused by Tenant. Any modifications, alterations or improvements mandated by any applicable federal, state or local law which relates to the Exterior Areas or other components of the Property, Building and Premises which Landlord is required to repair pursuant to this Lease shall be made by Landlord, at its own cost and expense. If Landlord is requested to cast its vote or give its approval in connection with any deed or other restriction affecting the Premises, then Landlord shall consult with Tenant and shall cast its vote or give or withhold its approval as Tenant may direct. Landlord shall either itself bring or allow Tenant to bring in Landlord's name (if brought by Tenant, at Tenant's expense); and shall otherwise reasonably cooperate with Tenant to the extent such cooperation is necessary in connection with an enforcement action in the event of any breach by others of any deed restriction applicable to the Property of which the Premises is a part.

Section 4.2.  Operation by Tenant.  Notwithstanding anything contained herein to the contrary, nothing in this Lease shall be construed as an obligation for Tenant to open or operate its business in the Premises, notwithstanding the foregoing, Tenant agrees to open a fully operational Mattress Firm for at least one day. Tenant has the right to remove Tenant's Property and to cease operations in the Premises at any time and in Tenant's sole discretion; provided, however; the right to cease operation of its business does not affect Tenant's obligation to pay all amounts due hereunder and to perform all other covenants and obligations hereunder. During any period Tenant operates its business in the Premises, Tenant agrees to conduct its business in a commercially reasonable manner, consistent with reputable business standards and practices. Further, in no event will Tenant be liable to Landlord for damages or otherwise as a result of operating other stores in the vicinity surrounding the Property or any other area, nor is Tenant limited or restricted in any way from opening or operating other stores in the vicinity surrounding the Property or in any other area.

Section 4.3.  Property; Additional Covenants of Tenant.  Landlord grants to Tenant, its officers, agents, employees and invitees the exclusive right to use all of the parking and other Exterior Areas of the Property (as well as the non-exclusive use of the Access Drives for ingress and egress), at no cost or expense to such parties. Landlord hereby represents, warrants, covenants and agrees that Tenant and its officers, agents, employees and invitees shall have access to the adjacent public rights of way and Access Drives at no cost or expense to any of such parties, via curb cuts located on the Property as well as over, across and through the adjacent retail property as shown on the Site Plan.  Without the prior written consent of Tenant (which may be given or withheld in Tenant's sole discretion), Landlord shall not: (a) alter or modify the Building, Exterior Areas or related access ways or curb cuts, or construct or permit any other buildings, free-standing signs, kiosks, or other improvements or structures on the Property, except for the Landlord's Work and as may otherwise be required by this Lease or applicable law; or (b) lease or otherwise authorize or allow the use or occupancy of any portion of the Property by anyone other than Tenant or, subject to Section 11.6 below. Tenant's assignees or sublessees.  Should the Premises fail or cease to have lawful vehicular access between the Premises and Cottonwood Drive, via the Access Drive or some other reasonable means of access, for a period in excess of seven (7) days after written notice given to Landlord. Rent shall abate until access is restored; and if access is not restored within thirty (30) days after said notice, Tenant may terminate this Lease by thirty (30) days' advance written notice given to Landlord prior to the restoration of such access; provided, however, if Landlord restores such access within such thirty (30) day notice period, Tenant's termination shall be null and void and of no further force or effect.

9

**EXHIBIT A**

Notwithstanding the foregoing or anything to the contrary, Tenant shall not be limited in any manner in its installation of its signage within the interior of the Premises provided such signage is in compliance with applicable laws and codes. In no event shall Landlord install or cause or allow to be installed any signage on the Building or Property, other than Tenant's signage and any pylon or monument sign provided for in Section 4.5 below.

Section 4.5.   Freestanding Signs.   Landlord shall, prior to the Turn Over Date and at Landlord's sole cost and expense, construct or cause to be constructed a monument sign substantially as and where shown on Exhibit "E" hereto, and shall thereafter cause such sign to be maintained in good condition. Landlord covenants and agrees that Tenant shall be entitled to install and display, throughout the Term, a sign panel in Tenant's trademarked or prototypical design on each side of the Monument Sign and any replacement thereof, in the panel position shown on Exhibit "E". Tenant agrees to pay its pro rata share of the maintenance cost of any such monument or pylon sign upon which Tenant has a panel (such pro rata cost to be determined by a fraction, the numerator of which shall be the area of Tenant's sign panels, and the denominator of which shall be the total area of all sign panel spaces on such sign whether or not occupied); and the cost to fabricate and install Tenant's sign panels shall be borne by Tenant.

Section 4.6.   Third Party Consents.   Landlord shall use commercially reasonable efforts to obtain any and all necessary consents or approvals which may be required of any third party for Tenant to use the Premises for the Permitted Use, install the Pre-Approved Signage, and perform Tenant's Work, other than governmental building and sign permits and Tenant business licenses.

## ARTICLE V.
## INSURANCE

Section 5.1.   Insurance Required of Tenant

(a)   Tenant, at Tenant's sole cost and expense, shall obtain and maintain in effect commencing with the delivery of possession of the Premises to Tenant and continuing throughout the Term, insurance policies providing for the following coverage: (i) all-risk property insurance against fire, theft, vandalism, malicious mischief, sprinkler leakage and such additional perils as now are or hereafter may be included in Special Form (All Risk) Coverage, insuring Tenant's Property; (ii) a commercial general liability policy, including insurance naming Landlord, as an additional insured, protecting against any and all claims for injury to persons or property occurring in or about the Premises and protecting against assumed or contractual liability under this Lease with respect to the Premises and the operations of Tenant and any subtenant of Tenant in, on or about the Premises, with such policy to be in the minimum amount of One Million Dollars ($1,000,000.00) per occurrence; and (iii) workers' compensation coverage as required by law. Tenant may satisfy its obligation to maintain commercial general liability insurance, as required pursuant to this Section 5.1, by obtaining a combination of primary liability and umbrella/excess liability policies.

(b)   All such insurance may be carried under a blanket policy covering the Premises and any other of Tenant's stores. All such insurance shall be written with insurers which carry an A.M. Best rating of at least A-, and shall contain endorsements that such insurance may not be cancelled with respect to Landlord (or its designees) except upon at least five (5) days prior

11

## EXHIBIT A

written notice to Landlord (and any such designees) by the insurance company. Tenant shall be solely responsible for payment of premiums. The minimum limits of the commercial general liability policy of insurance shall in no way limit or diminish Tenant's liability under the other provisions of this Lease. Tenant shall deliver to Landlord at least five (5) days prior to the time such insurance is first required to be carried by Tenant, and thereafter no more than five (5) days following the expiration of such policy, certificates of such insurance evidencing compliance with its obligations hereunder, together with evidence satisfactory to Landlord of the payment of the premiums thereon.

Section 5.2. Waiver of Claims and Subrogation. Landlord and Tenant hereby waive all rights to claims for damages as against the other and the other's insurance companies; and Landlord's and Tenant's insurance policies shall contain provisions requiring that the respective insurance companies waive all rights of subrogation as against Landlord and Tenant and as against the other's insurance companies, which other party has, to which may arise hereafter, for damage to the Premises or the Property, damage to or personal property located in the Property loss of business; any property loss for which either party may be reimbursed as a result of insurance coverage affecting any property loss suffered by it, or any other loss caused by perils typically covered by the and extended coverage, building contents, store contents and business interruption insurance coverage.

Section 5.3. Landlord's Insurance. Landlord shall carry, throughout the Term of this Lease, Special Perils property coverage covering all buildings and improvements on the Property (including the Premises) on a full replacement cost basis and which policy shall include, without limitation, the insurance with extended coverage and coverage for vandalism, burglary, malicious mischief, sprinkler damage, and water damage ("Landlord's Insurance").

## ARTICLE VI.
## REPAIRS AND MAINTENANCE

Section 6.1. By Landlord. Landlord shall, at its sole cost and expense, repair all damage to the Building structure, or exterior parking, driveways, and landscape areas of the Property caused by subsidence or other structural or latent defects and maintain in good condition and repair (and replace, when needed) the roof (including the roof membrane, roof structure and all elements supporting the floor or roof), gutters, downspouts, the utility lines, exterior wiring, plumbing, pipes, conduits and associated equipment which serve the Property but are not located within the interior of the Premises, all structural portions of the Building (including without limitation the foundations, exterior walls, columns, and floor slab), and make all needed repairs including restoration, slurry resurfacing, and/or replacing as needed, of the exterior parking, driveways, sidewalks, curbs, and drainage system and improvements, except such repairs as are necessitated by the wrongful acts or inaction of the Tenant and its employees and sub-lessees, and all repairs required by reason of any act or omission, whether intentional or negligent, of Landlord or its employees, agents, or contractors. Landlord, at its sole cost and expense, shall also cause or use commercially reasonable efforts to cause the Access Drives to be properly maintained, including any needed repairs, resurfacing, and/or repaving. Notwithstanding the above, the reasonable documented cost of any needed parking slurry and restriping of the parking areas on the Property which is performed by Landlord (after initial construction and striping as part to Landlord's Work), and no more often than semi-annually shall be paid or reimbursed by Tenant within thirty (30)

12

EXHIBIT A

days after Tenant' receipt of a related invoice including documentation of the associated costs. The terms of this Section 6.1 shall survive the expiration or earlier termination of this Lease. All maintenance, repairs and replacements performed by or for Landlord shall utilize good quality workmanship and materials conforming to the original specifications.

**Section 6.2. By Tenant.** Except as set forth in Section 6.1 and Section 6.3, from and after the Turn Over Date Tenant shall maintain and repair the interior of the Premises, including all windows, wall coverings, ceilings, and plumbing and electrical fixtures, mechanical systems, HVAC and other elements within and exclusively serving the Premises, and shall perform the day to day maintenance (but not repair, slurry, restripe, resurfacing or recovery) of the exterior parking including snow removal, and day to day maintenance of Landscaped areas, keep the Premises neat and clean, and make and pay for all repairs to the non structural portions of the Premises and all equipment and systems exclusively serving the Premises which are located within the interior thereof. Tenant shall also be responsible to reimburse Landlord for the Crown Point Owner's Association dues ("Dues") incurred and paid by Landlord with respect to the Property during the Term, in an amount not to exceed $105.00 per month for the first Lease Year, such monthly cap to increase by five percent (5%) annually on the first day of each subsequent Lease Year, determined on a compounded basis to $105.00 during the second Lease Year, then 1.05 times $105.00 during the second Lease Year, and so on, with such reimbursement to be made on a monthly or other periodic basis determined by Landlord, but at least annually, within thirty (30) days after Tenant's receipt of a related invoice including documentation of the subject dues. Promptly following the end of each Lease Year, Landlord shall deliver to Tenant a written statement of the actual Dues incurred by Landlord and reimbursable by Tenant in and for such Lease Year, which statement shall include a copy of all relevant owner association bills to the extent not theretofore provided to Tenant. Any overpayment or underpayment of Dues by Tenant for such Lease Year shall be refunded within thirty (30) days thereafter, or (in the case of any overpayment) Tenant may credit such amount against the next one installments of Rent payable hereunder. The provisions of this Section 6.2 shall not limit Landlord's obligation to restore or repair under Article VIII hereof in the event of fire or other casualty or condemnation. If (i) Tenant does not repair property as required hereunder, (ii) Landlord, in the exercise of its reasonable discretion determines that emergency repairs are necessary, or (iii) repairs or replacement to the Premises are required by reason of any act or omission whether intentional or negligent, of Tenant or its employees, agents or contractors, then Landlord may (but shall not be required to) make such repair and upon completion thereof and within thirty (30) days of Tenant's receipt of written demand therefor, Tenant shall reimburse Landlord for the reasonable out-of-pocket costs of such repairs, plus ten percent (10%) of such costs. Landlord shall and does hereby assign to Tenant all assignable warranties and guarantees received in connection with the construction of the Premises or any repair or replacement thereof pertaining to any portion of the Premises and associated HVAC which Tenant is required to maintain or repair, and Landlord shall use commercially reasonable efforts to enforce any such assignable warranties and guarantees if Tenant's request in behalf of Tenant; provided, however, that nothing herein shall relieve Landlord from any warranty obligation provided in this Lease. Upon the expiration or termination of this Lease, all such warranties and guarantees shall be and are hereby reassigned to Landlord without further notice, act or document of any kind.

**Section 6.3. HVAC.** Subject to and without waiving applicable warranties or required Landlord's Work, Landlord and Tenant agree as follows with respect to the maintenance, repair

13

**EXHIBIT A**

and replacement of any heating, ventilation and air conditioning ("HVAC") system and equipment serving the Premises ("HVAC System"):

(a)     Tenant, at Tenant's sole cost, (i) will contract with a qualified service company for the regular (but not less frequently than quarterly) maintenance of the HVAC System, (ii) will provide Landlord with a copy of any service contract within ten (10) days following a request by Landlord, and (iii) will cause such contractor to perform all routine maintenance and repair work required to conform to standard maintenance practices for a system such as the HVAC System.   For purposes hereof, "routine maintenance and repair work" means all repairs and replacements other than Major Component Replacements.  "Major Component Replacements" means replacement of the HVAC System or the major components thereof.

(b)     Tenant shall perform all Major Component Replacements when recommended by Tenant's contractor in accordance with standard maintenance practices for a system such as the HVAC System, which work (including parts, labor, material and associated charges and taxes to the extent not paid by warranties provided by Landlord or the manufacturer) shall be at Tenant's sole cost and expense.  Notwithstanding the foregoing, if Tenant is required to perform any Major Component Replacement during the last twenty-four (24) months of the Term because repair alone would not, per standard maintenance practices, be considered appropriate, and if the useful life of the replacement (as reasonably determined by Tenant in accordance with accordance with generally accepted accounting principles, or the Internal Revenue Code and Regulations) is such that the related cost incurred by Tenant cannot be fully amortized on a straight-line basis over the remainder of the Term, then Tenant shall be reimbursed by Landlord by that amount of the then unamortized, reasonable cost of such replacement for the period beyond the remainder of the Term, provided the replacement was not necessitated by Tenant's negligence or failure to properly maintain the HVAC System.  Such reimbursement shall occur within thirty (30) days of Tenant invoicing Landlord for the appropriate portion of the total cost, as evidenced by reasonable supporting documentation; however, that if there remain any extension option(s) under Section 11.13, and such option(s) are duly exercised, then Tenant shall repay Landlord the portion of the reimbursement that Tenant originally received and is applicable to the Extension Period at the commencement of such Extension Period.

Section 6.4.  Inspection.  Upon forty-eight (48) hours prior written notice to Tenant, Landlord or its representatives shall have the right to enter the Premises during any business day (meaning Monday through Friday excluding national holidays, provided the foregoing limitation shall not apply in an emergency) during the Term for the purpose of inspecting same or making needed repairs, so long as Landlord's interference with the business of Tenant is minimized as is reasonably practicable.   In entering the Premises, Landlord and its agents, contractors or employees shall (i) enter only during Tenant's normal business hours (except in emergencies), and (ii) use reasonable efforts not to obstruct or disturb the visibility of or access to the Premises or unreasonably disturb or inconvenience Tenant in the conduct of its business in the Premises.  If such entry by Landlord or its agents or employees onto the Premises or such maintenance, repair or replacement renders the Premises unusable for the conduct of Tenant's business for more than forty-eight (48) consecutive hours, then all Base Rent and Additional Rent shall be abated until Tenant's use of the Premises is restored.

## ARTICLE VII.

14

## EXHIBIT A

condemnation, and (ii) any separate award for loss of or damage to Tenant's improvements, trade fixtures, removable personal property and unamortized Tenant's Work that have been paid for by Tenant. Further, Tenant shall be entitled to claim, prove and receive, at Tenant's sole cost, in such condemnation proceedings, such award as may be allowed for relocation costs, fixtures, goodwill, loss of profits, and other equipment installed by it but only if such award shall be in addition to the award for the Land and Building (or portion thereof) containing the Premises.

## ARTICLE IX.
## SUBORDINATION AND NON-DISTURBANCE

**Section 9.1.   Subordination of Lease.**  Subject to the limitations set forth in this Article IX below, Tenant agrees that this Lease is, and shall be, subordinate to any mortgage, deed of trust, deed to secure debt, or any other hypothecation for security (any such instruments being referred to hereafter as a "Mortgage") which has been or which hereafter may be placed upon the Property or the Premises, unless the holder of a Mortgage elects to make this Lease superior to its Mortgage in the manner set forth below.  The holder of any Mortgage may elect that this Lease shall be superior to its Mortgage, and upon written notification of such election this Lease shall automatically be superior to said Mortgage whether this Lease is dated prior to or subsequent to the date of the Mortgage.  In the event of a foreclosure of any Mortgage or sale in lieu of foreclosure, on the condition that all of Tenant's rights under this Lease shall not be impaired or disturbed, Tenant hereby agrees to attorn to the successor to Landlord's interest hereunder. Notwithstanding anything to the contrary contained in this Lease, neither Landlord, nor holder of a Mortgage, nor any successor to Landlord's interest hereunder shall disturb Tenant in its possession of the Premises during the Term, and Tenant's rights under this Lease shall not be affected or terminated, so long as Tenant is not in default under this Lease beyond the expiration of all applicable notice and cure periods and provided that Tenant attorns to any mortgagee.

**Section 9.2.   Non-Disturbance.**  As a condition to Tenant's subordination of this Lease as set forth in Section 9.1 above, Landlord shall secure and deliver to Tenant a recorded subordination, non-disturbance, and attornment agreement, in the form attached hereto as Exhibit "H" or such other commercially reasonable form as is required by Landlord's mortgagee (a "SNDA"), stating, among other things, that in the event of a foreclosure or deed in lieu of foreclosure, for so long as Tenant is not in default beyond the expiration of all applicable notice and cure periods, this Lease shall be recognized and Tenant's occupancy shall not be disturbed.  If Landlord has not delivered the SNDA to Tenant as required herein, as to any Mortgage existing on the date of this Lease, by the earlier of the Turn Over Date or one hundred eighty (180) days after the Effective Date of this Lease, then Tenant may, at its option, terminate this Lease by written notice to Landlord delivered at any time following the expiration of such 30-day period and before such SNDA is provided to Tenant.  Notwithstanding the provisions of this Article IX, this Lease shall not be subordinate to a future Mortgage unless the holder of such Mortgage executes, and delivers to Tenant, a SNDA.

## ARTICLE X.
## DEFAULT

**Section 10.1.   Events of Default.**  Any of the following shall constitute an Event of Default under this Lease:

## EXHIBIT A

(a)    The failure of Tenant to pay any monthly installment of Rent when due and such failure continues for ten (10) days after Tenant's receipt of written notice thereof (except that no more than two (2) such notices shall be required in any Lease Year, after which, for the remainder of such Lease Year, an Event of Default shall occur if Tenant fails to pay any monthly installment of Rent on or before ten (10) days after the date due);

(b)    The failure of Tenant to make any other payment provided for under this Lease when due and such failure continues for thirty (30) days after Tenant's receipt of written notice thereof;

(c)    The failure of Tenant to perform or observe any obligation, covenant, or term required to be performed or observed by Tenant under this Lease other than the payment of money, and such failure is not cured by Tenant within thirty (30) days after written notice thereof to Tenant (provided that in the case of any default referred to in this clause (c) which cannot be cured by the payment of money and cannot with diligence be cured within such thirty (30) day period, if Tenant shall commence to cure the same within such thirty (30) day period and thereafter shall prosecute the curing of same with diligence and continuity, then the time within which such failure may be cured shall be extended for such period as may be necessary to complete the curing of the same with diligence and continuity);

(d)    A receiver is appointed to take charge of substantially all of Tenant's assets, and such appointment is not discharged within sixty (60) days after such appointment;

(e)    Tenant makes an assignment for the benefit of Tenant's creditors;

(f)    A petition or other proceeding is filed by or against Tenant under the bankruptcy laws of the United States, or under the insolvency laws of any state and such petition or other proceeding is not discharged within sixty (60) days after such filing; or

(g)    Tenant uses the Premises in the commission of a crime or intentionally damages the Premises, the Building or any part of the Property; it being agreed that the occurrence of a crime within or about the Premises (even if involving the participation of a Tenant employee whose conduct has not been authorized or knowingly allowed by Tenant to continue) shall not, in and of itself, be deemed to violate this subparagraph (g).

Section 10.2.   Landlord's Rights on Default.

(a)    Upon the occurrence and during the continuance of any one or more of the aforesaid Events of Default, Landlord may, at Landlord's option, without any demand or notice whatsoever (except as expressly required in this Section 10.2):

(i)    Terminate this Lease by giving Tenant notice of termination, in which event this Lease shall expire and terminate on the date specified in such notice of termination with the same force and effect as though the date so specified were the date herein originally fixed as the termination date of the Term of this Lease, and all rights of Tenant under this Lease and in and to the Premises shall expire and terminate and Tenant shall remain liable for all obligations under this Lease arising up to the date of such termination and Tenant shall surrender the Premises to Landlord on the date specified in such notice, and if Tenant fails to so surrender Landlord shall

18

**EXHIBIT A**

have the right, without notice, to enter upon and take possession of the Premises and to expel or remove Tenant and its effects without being liable for prosecution of any claim for damages therefor; or

(ii)   Terminate this Lease as provided in Subsection 10.2(a)(i) hereof and recover from Tenant all actual damages incurred by reason of such breach, including the actual, documented cost of recovering the Premises and the worth at the time of such termination of the excess, if any, of the amount of Base Rent, Additional Rent and all other charges reserved in this Lease, payable over the remainder of the stated Term, over the then reasonable rental value of the Premises for the remainder of the stated Term, all of which amounts shall be discounted to present value at a reasonable discount rate, and immediately due and payable from Tenant to Landlord as if by terms of this Lease it were payable in advance. Landlord may immediately proceed to collect, or bring action for the worth of the whole Rent, reduced by the reasonable rental value and discounted to present value as aforesaid, or any part thereof reduced as aforesaid, as Rent being in arrears; or

(iii)   Without terminating this Lease, remove all persons and property from the Premises without being deemed guilty of trespass or becoming liable for any loss or damage which may be occasioned thereby and make such alterations and repairs as may be necessary, in Landlord's reasonable determination, in order to relet the Premises for a term, rental rate and conditions as Landlord, in its commercially reasonable discretion, may deem advisable. Upon reletting, rentals received by Landlord from such reletting shall be applied first to the payment of any indebtedness other than Base Rent due hereunder from Tenant; second to the payment of the most current Base Rent owed at that time; third to the payment of reasonable, out-of-pocket costs and expenses of such reletting, including brokerage fees, reasonable attorneys' fees and costs of alterations and repairs, (but not beyond alterations to restore the Premises to a "vanilla shell" condition), and the residual, if any, shall be held by Landlord and applied to payment of future Base Rent as the same may become due and payable hereunder from Tenant. If such rentals received from such reletting are less than that to be paid by Tenant, Tenant shall be liable for the deficiency to Landlord. Any such deficiency shall be calculated and due monthly. No such re-entry or taking possession of the Premises by Landlord shall be construed as an election on its part to terminate this Lease or to accept a surrender thereof; or

(iv)   Without terminating this Lease, cure such default for the account of Tenant (without waiving any claim for breach of this Lease), including, without limitation, the right to pay or do any act which reasonably requires the expenditure of any sums of money by reason of the failure or neglect of Tenant to perform any of the provisions of this Lease, and in the event Landlord shall, at its election, pay such sums or do such acts requiring the expenditure of monies, Tenant agrees to pay Landlord, within thirty (30) days of Tenant's receipt of written demand therefor, all such reasonable, out-of-pocket sums so paid by Landlord, plus ten percent (10%) thereof, which shall be deemed Additional Rent and be payable as such under this Lease; or

(v)   Without terminating this Lease, allow the Premises to remain unoccupied and collect Rent from Tenant as it comes due subject to the obligation of Landlord to mitigate its damages as set forth hereinbelow.

**EXHIBIT A**

(h)     If this Lease shall terminate as a result of an Event of Default hereunder, any funds of Tenant held by Landlord may be applied by Landlord to any damages payable by Tenant (whether provided for herein or by law) as a result of such termination or default.

(c)     Neither the commencement of any action or proceeding, nor the settlement thereof, nor entry of judgment hereon shall bar Landlord from bringing subsequent actions or proceedings from time to time; nor shall the failure to include in any action or proceeding any sum or sums then due be a bar to the maintenance of any subsequent actions or proceedings for the recovery of such sum or sums so omitted.

(d)     The failure of Landlord to insist upon performance of any of the terms, conditions and covenants herein shall not be deemed to be a waiver of any right or remedies that Landlord may have and shall not be deemed a waiver of any subsequent breach or default in the terms conditions and covenants herein contained except as may be expressly waived in writing. The maintenance of any action or proceeding to recover possession of the Premises, or any installment or installments of Base Rent, or any other moneys that may be due or become due from Tenant to Landlord, shall not preclude Landlord from thereafter instituting and maintaining subsequent actions or proceedings for the recovery of possession of the Premises or of any other moneys that may be due or become due from Tenant. Any entry or re-entry by Landlord shall not be deemed to absolve or discharge Tenant from liability hereunder.

Section 10.3.  Mitigation of Damages.  Notwithstanding anything to the contrary, contained in this Lease, upon a default by Tenant, (i) Landlord shall take commercially reasonable efforts to mitigate its damages, (ii) any costs of reletting chargeable to Tenant pursuant to the terms of this Lease shall exclude any costs to restore the Premises beyond a "vanilla shell" condition, any market concessions granted to a replacement tenant, and the unamortized portion of the costs attributable to the portion of the new tenant's term exceeding the Term hereof, (iii) if Landlord has the right to accelerate Rent pursuant to this Lease or at law, in no event shall Landlord have the right to accelerate the future Rent or any other sums other than as noted in Subsection 10.2(a)(iii) above, and (iv) in no event shall Tenant be liable to Landlord for consequential, indirect, speculative or punitive damages under this Lease including without limitation any damages Landlord may have with respect to co-tenancy violations under other leases or penalties under other agreements due to any holdover by Tenant.

Section 10.4.  Abandonment of Personal Property.  Should Tenant fail to remove its personal property upon abandonment, expiration, termination or recovery of possession and after thirty (30) days' written notice to Tenant to remove its property, said notice to also be conspicuously posted on the Premises, all personal property of any nature then remaining on the Premises shall be deemed abandoned and title thereto shall vest exclusively in Landlord. Landlord may thereafter remove and dispose of or liquidate said personal property as Landlord may deem proper in its sole and absolute discretion, provided, however, the proceeds of any sale or liquidation of such property shall be applied first to reduce any sums owed by Tenant to Landlord, including storage costs, attorneys' fees and any other expenses incurred by Landlord resulting from such abandonment, and any sums remaining shall be returned to Tenant. Tenant hereby waives any claim for loss or damage arising from Landlord's dealing with Tenant's Property pursuant to the terms of this Section 10.4.

**EXHIBIT A**

**Section 10.5.  Default by Landlord.**

(a)     If Landlord shall fail, refuse or neglect to comply with Landlord's obligations in accordance with the terms of this Lease, and if Landlord shall not cure such failure, refusal or neglect within thirty (30) days after notice from Tenant specifying same (or, if such failure, refusal or neglect shall reasonably take more than thirty (30) days to cure, Landlord shall not have commenced the same within the thirty (30) days and diligently prosecuted the same to completion), Tenant may, at Tenant's option, without waiving any claim for damages for breach of agreement, at any time thereafter cure such failure, refusal or neglect on Landlord's behalf, provided that Tenant may cure any such failure, refusal or neglect as aforesaid prior to the expiration of said cure period, without notice to Landlord, if an emergency situation exists but solely if the curing of such breach or failure prior to the expiration of said cure period is necessary to protect the Premises or Tenant's interest therein or to prevent injury or damage to persons or property.  Landlord shall reimburse Tenant for any amounts reasonably incurred by Tenant as aforesaid within thirty (30) days of Tenant's written demand therefor.

(b)     If Landlord fails to pay or reimburse Tenant any amount due to Tenant by Landlord pursuant to the provisions of this Lease (including, without limitation, Section 6.3(b), Section 10.5(A) and Section 11.24) within the time period required therein, Tenant may deduct such amounts (plus a late charge equal to the lesser of (ten percent (10%) of the amount due or the maximum late charge permitted under the circumstances by applicable law) from the next installments of Rent due hereunder until Tenant has recouped such costs; provided that if this Lease shall terminate prior to Tenant's being reimbursed in full through such Rent deductions, Landlord shall promptly pay to Tenant the remainder, which obligation shall survive Lease termination.  Landlord acknowledges that late payment by Landlord to Tenant will cause Tenant to incur costs that are extremely difficult to ascertain in an exact amount.  The parties agree that the above specified late charge represents a fair and reasonable estimate of the costs that Tenant will incur by reason of Landlord's late payment.

(c)     No reference to any specific right or remedy shall preclude Tenant from exercising any other rights or from having any other remedy or from maintaining any action to which it may otherwise be entitled at law or in equity.  No failure by Tenant to insist upon the strict performance of any agreement, term, covenant or condition hereof, or to exercise any right or remedy consequent upon a breach thereof, shall constitute a waiver of any such breach, agreement, terms, covenant or condition.  No waiver by Tenant of any breach by Landlord under this Lease shall affect this Lease in any way whatsoever.

**Section 10.6.  Inability to Perform and Force Majeure.**  Except as to the timely payment of monetary obligations hereunder, and subject to the limitation specified in Section 1.5 hereof as to the Outside Delivery Date, Landlord and/or Tenant shall be excused for the period of any delay and neither party shall be deemed in default with respect to the performance of any of the terms, covenants, and conditions of this Lease to be performed by it if any failure of its performance shall be due to any strike, lockout, civil commotion, war, warlike operating, invasion, rebellion, hostilities, military or usurped power, sabotage, governmental regulations or controls, inability to obtain any material or service, Act of God, weather, or any other cause whatsoever (including failure of either party to supply necessary data or instructions) beyond the reasonable control of such party ("Force Majeure"), and the time for performance by such party shall be

21

**EXHIBIT A**

extended by the period of delay resulting from or due to any of said causes so long as the affected party notifies the other in writing (with reasonably satisfactory evidence of such event causing such Force Majeure delay), within five (5) business days of the occurrence of the event of Force Majeure (failing which the party will be deemed to have waived its right to claim a Force Majeure delay therefor, including delays in the Turn Over Date), provided, however, in the event the period of delay resulting from or due to any of said causes exceeds one hundred eighty (180) days, either party may terminate this Lease upon written notice to the other. Additionally, in no event shall this Section 10.6 delay Tenant's right to terminate pursuant to Section 8.1(a) for a failure by Landlord to substantially complete casualty restoration within the period provided for therein, nor shall any delays in obtaining the permits necessary to perform or complete Landlord's Work qualify as Force Majeure for purposes of this Lease.

## ARTICLE XI.
## OTHER PROVISIONS

**Section 11.1.   Definition and Liability of Landlord.**  The term "Landlord" as used in this Lease shall mean only the owner or mortgagee in possession for the time being of the Building in which the Premises is located or the owner of a leasehold interest in said Building or the land thereunder so that in the event of the sale of said Building or leasehold interest or an assignment of this Lease, or a demise of said Building or land, Landlord shall be and is hereby entirely free and relieved of all obligations of Landlord subsequently accruing.  It is specifically understood and agreed that, except with regard to a breach of Landlord's environmental indemnities set forth in Section 11.20, there shall be no personal liability of Landlord in respect to any of the covenants, conditions or provisions of this Lease, in the event of a breach or default by Landlord of any of its obligations under this Lease, except with regard to a breach of Landlord's environmental indemnities set forth in Section 11.20, Tenant shall look solely to the interest or equity of Landlord in the Property and the rents, income, profits and proceeds from the Property for the satisfaction of Tenant's remedies. Nothing herein shall prohibit or restrain Tenant from seeking injunctive relief or proceeding against rents, revenues, net insurance proceeds or net sale proceeds available to Landlord as to the Property.

**Section 11.2.   Relationship of the Parties.**  Nothing contained in this Lease shall be deemed or construed as creating the relationship of principal and agent or a partnership or joint venture between the parties hereto, it being understood and agreed that neither the method of computing rents nor any other provision contained herein nor any acts of the parties hereto shall be deemed to create any relationship between the parties other than that of landlord and tenant.

**Section 11.3.   Legal Expenses.**  If either party hereto is made or becomes a party to any litigation commenced by or against the other party involving the enforcement of any of the rights and remedies of such party, or arising on account of the default of the other party in the performance of such party's obligations hereunder, then the prevailing party in any such litigation or the party becoming involved in such litigation because of a claim against such other party, as the case may be, shall receive from the other party all costs and reasonable attorneys' fees incurred by such party at trial and on appeal in connection with such litigation.

**Section 11.4.   Indemnity.**

22

**EXHIBIT A**

Notwithstanding the foregoing or anything to the contrary contained in this Lease, the consent of Landlord shall not be required (i) for any subletting to a licensed and properly trained franchisee of either Mattress Firm, Inc. or any Related Entity (as herein below defined) or their respective successors in interest (provided such franchisee or one or more of its owners, directors, managers or officers has at least three (3) years of retail experience), (ii) for any assignment, subletting or transfer to a Related Entity, or (iii) for any assignment or transfer in connection with a merger, reorganization, or sale of all or substantially all of the assets of Tenant to any other person or entity. "Related Entity" shall mean any person, trust, corporation, limited liability company, partnership, venture or other entity which, directly or indirectly, controls, or is controlled by, or is also controlled by the same entity having a controlling interest in Tenant. In addition, any sale, issuance or other transfer whatsoever by Tenant (or any other person or entity) of stock or other ownership interests in Tenant or any Related Entity (whether in public offering, or subsequent thereto, or pursuant to a private placement or other similar transaction, or subsequent thereto, or in any other transaction) shall not require Landlord's consent or be otherwise restricted or prohibited. The transactions permitted without Landlord's consent pursuant to this paragraph are hereinafter referred to as the "Permitted Transfers", and the parties with whom Tenant is permitted to effect such Permitted Transfers are hereinafter referred to as "Permitted Transferees". In no event shall Tenant be permitted to use a series of one or more Permitted Transfers solely for the purpose of "spinning off" the Lease to an independent third party that would not otherwise be a Permitted Transferee. As an example of the foregoing, Tenant shall not assign the Lease to an affiliate corporation whose assets consist solely of the Lease and the rights granted herein and thereafter sell the stock of such affiliated corporation to an independent third party, with the intended result being to defeat the purpose of this paragraph by the transfer of the Lease to an independent third party by means of what would otherwise be two (2) separate Permitted Transfers.

Section 11.7.   Surrender of Premises.  At the expiration or termination of the tenancy hereby created, Tenant shall surrender the Premises in good condition and repair, reasonable wear and tear and damage by casualty and condemnation excepted, and Tenant shall surrender all keys for the Premises to Landlord at the place then fixed for the payment of Rent and shall inform Landlord of all combinations on locks, safes and vaults, if any, in the Premises.  Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of this Lease.  Prior to the expiration or sooner termination of this Lease, and except as otherwise provided below in this Section 11.7, Tenant shall remove Tenant's Property from the Premises, and Tenant shall repair any material damage to the Premises caused by such removal.  In the event Tenant does not make such repairs, Tenant shall be liable for and agrees to pay Landlord's cost and expenses in making such repairs, which obligation shall survive expiration or termination of this Lease.  Tenant shall not remove or be required to remove any plumbing or electrical fixtures or equipment, heating or air-conditioning equipment, floor coverings (including, but not limited to, wall-to-wall carpeting), walls or ceilings, all of which shall be deemed to constitute a part of the interest and estate of Landlord nor shall Tenant remove any fixtures or machinery that were furnished or paid for by Landlord whether initially installed or replaced.  The Premises shall be left in a broom-clean condition.

Section 11.8.   Holdover by Tenant.  In the event that Tenant shall hold the Premises after the expiration of the Term without the express written consent of Landlord, and provided further that Landlord has accepted rental from Tenant during the holdover period, such holding over shall be deemed to have created a tenancy at sufferance, upon a monthly rental basis, and otherwise

**EXHIBIT A**

subject to all the terms and provisions of this Lease, except as contemplated to the contrary in this Section 11.8. Such monthly rental shall be computed on the basis of one hundred twenty-five percent (125%) of the monthly installment of Base Rent owing under this Lease during the immediately preceding Lease Year and one hundred percent (100%) of the Additional Rent and all other additional charges provided by this Lease. During such tenancy, Landlord shall have the right at any time to enter the Premises to show the Premises to prospective tenants.

Section 11.9.   Liens.   No work performed by Tenant pursuant to this Lease, whether in the nature of construction, erection, alteration or repair, shall be deemed to be for the immediate use and benefit of Landlord so that no mechanic's or other liens shall be allowed against the estate of Landlord by reason of any consent given by Landlord to Tenant to improve the Premises. Tenant shall pay promptly all persons furnishing labor or materials with respect to any work performed by Tenant or its contractors on or about the Premises. If any mechanic's or other liens shall at any time be filed against the Premises or the Property of which the Premises is a part by reason of work, labor, services or materials performed or furnished, or alleged to have been performed or furnished, to Tenant or to anyone holding the Premises through or under Tenant, and regardless of whether any such lien is asserted against the interest of Landlord or Tenant, Tenant shall forthwith cause the same to be discharged of record or bonded to the reasonable satisfaction of Landlord. If Tenant shall fail to cause such lien forthwith to be so discharged or bonded after being notified in writing of the filing thereof, then, in addition, to any other right or remedy of Landlord, Landlord may bond or discharge the same by paying the amount claimed to be due, and the amount so paid by Landlord, including reasonable attorneys' fees incurred by Landlord either in defending against such lien or in procuring the bonding or discharge of such lien, plus ten percent (10%) thereof shall be due and payable by Tenant to Landlord as Additional Rent, within thirty (30) days of Tenant's receipt of a written invoice for same.

Section 11.10.   Late Payments and Uncollectible Checks.   In the event Tenant fails to pay Landlord any monthly installment of Rent on or before five (5) business days after the date due (and, as to the first such delinquency occurring in any Lease Year, such failure is not cured within ten (10) days after written notice to Tenant), Tenant shall pay to Landlord a late payment fee in the amount of $500.00 and, in addition thereto, such late amounts shall bear interest at the Interest Rate (accruing from the date due) until received by Landlord. Said interest shall be Additional Rent and shall be payable together with the next installment of Base Rent. Tenant shall pay Fifty Dollars ($50.00) for any check that Tenant delivers to Landlord, which is not honored when presented for collection due to Tenant having insufficient funds in its account. Should Tenant deliver an uncollectible check, Landlord can require Tenant to make rental payments with cash or cashier's check.

Section 11.11.   Waiver of Certain Rights.   Landlord and Tenant (and any subtenant) hereby mutually waive any and all rights which either may have to request a jury trial in any action, proceeding or counterclaim (except for those involving personal injury or property damage) arising out of this Lease or Tenant's occupancy of or right to occupy the Premises. Tenant further agrees that in the event Landlord commences any summary proceeding for nonpayment of Rent or possession of the Premises, Tenant will not interpose and hereby waives all right to interpose any permissive counterclaim of whatever nature in any such proceeding. The parties each waive any right to the award of consequential or exemplary damages in any amount.

**EXHIBIT A**

**Section 11.12.   Notices.**   Any notice, demand, request, consent, approval or other communication which either party hereto is required or desires to be given to the other shall be in writing and shall be given by private express delivery mail (with confirmation of receipt), or by personal delivery or by registered or certified mail, addressed to Landlord or to Tenant at the location shown in Section 1.1(k), except, however, that any monthly rent statements or invoices, real estate tax and insurance bills and reconciliations, monthly property payables and the like shall be addressed to Tenant at the location shown in Section 1.1(l). Any notice, demand, request, consent, approval or other communication so sent shall be deemed to have been given as the case may be, upon delivery if by express mail or personal delivery and five (5) business days after the same was so addressed and deposited in the United States mail as certified mail, with postage thereon fully prepaid. Time for response in any such notice shall commence from the date of actual receipt of such notice. If delivery is refused or not able to be made, the day delivery was first attempted shall be deemed the delivery date. The purported giving of notice or exercise by either party of any right, option or privilege by any means other than written notice given in strict compliance with this Section 11.12 shall be null, void and of no force or effect, even if any such other means of communication succeeds in conveying actual notice. Either party may change its Address for Notices by written notice to the other, and Tenant may change its Address for Rent Statements by written notice to Landlord. Each of the parties hereto expressly agrees that its respective attorney shall be authorized to deliver notices on its behalf.

**Section 11.13.   Renewal.**   Tenant or any successor pursuant to a transfer permitted or consented to under Section 11.6 hereof shall have the separate and consecutive options to extend the Term of this Lease for the Extension Periods described in Section 1.1(e), provided (i) written notice of the exercise of an option is given to Landlord not more than one hundred eighty (180) days but not fewer than sixty (60) days prior to the expiration of the then current Term of this Lease and (ii) Tenant is not in default under the terms of this Lease beyond applicable notice and cure periods at the time of exercise of this option.   If the option to extend is exercised, the Base Rent for the subject Extension Period shall be as shown in the Base Rent table in Section 1.1(e) above.

**Section 11.14.   Recording and Short Form Lease.**   Neither party shall record this Lease without the express prior written consent of the other; provided, however, that each party agrees to execute, acknowledge and deliver at any time after the date of this Lease, at the request of the other party, a "Short Form Lease" suitable for recording. All recording costs, fees or charges due and payable upon the recording of such "Short Form Lease" (including, without limitation, any and all taxes due or collectible upon such recording) shall be payable in full by the party requesting the same.

**Section 11.15.   Entire and Binding Agreement; Applicable Law.**   This Lease contains all of the agreements between the parties hereto, and it may not be modified in any manner other than by agreement in writing, signed by all the parties hereto or their successors in interest. The terms, covenants and conditions contained herein shall inure to the benefit of and be binding upon Landlord and Tenant and their respective successors and assigns, except as may be otherwise expressly provided in this Lease. This Lease and the rights and duties of the parties hereunder, shall be construed in accordance with the laws of the State of Colorado, without regard to the conflicts of laws principles recognized in such state,

**EXHIBIT A**

**Section 11.16.   Provisions Severable.**   If any terms or provisions of this Lease, or the application thereof to any person or circumstance shall, to any extent, be held to be invalid or unenforceable by a court of competent jurisdiction, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable shall not be affected thereby and each term and provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

**Section 11.17.   Captions.**   The captions contained herein are for convenience and reference only and shall not be deemed a part of this Lease or construed as in any manner limiting or exemplifying the terms and provisions of this Lease to which they relate.

**Section 11.18.   Estoppel Certificates.**   At any time and from time to time (but no more than once in any 12-month period; provided, if Landlord requests more than one (1) such statement in any twelve (12) consecutive month period, then as a condition to the obligation of Tenant to review and execute same, Landlord shall pay to Tenant, contemporaneously with Landlord's request for same, a fee equal to Five Hundred Dollars ($500.00)), each of the parties hereto shall, within thirty (30) days after receipt of the written request of the other party, execute, acknowledge and deliver to the requesting party, stating, if true, (i) that this Lease is a true and exact copy of the lease between the parties hereto, (ii) that there are no amendments hereof (or, if amended specifying the amendments hereof), (iii) that this Lease is then in full force and effect and that, to the certifying party's actual present knowledge, there are no offsets, defenses or counterclaims to the payment of Rent reserved hereunder or the performance of the terms, covenants and conditions hereof on the part of Tenant or Landlord, as the case may be, to be performed (or, if not so, setting forth the nature of the offsets, defenses or counterclaims then existing), and (iv) that as of such date, no default has been declared hereunder by either party or, if not true, specifying the nature of such default.   Tenant acknowledges that the form of estoppel certificate attached to this Lease as Exhibit "D" is satisfactory to Tenant.

**Section 11.19.   Joint and Several Liability.**   If Tenant is comprised of more than one party, the obligations and duties of Tenant hereunder shall be joint and several.

**Section 11.20.   Environmental Matters.**

(a)      Landlord hereby represents that, to the best of Landlord's knowledge, as of the Effective Date and as of the Rent Commencement Date, (i) the Premises and the Property (including all improvements, and groundwater) now comply with all Environmental Laws (defined below) and are not contaminated with any Hazardous Materials (defined below); (ii) that any Hazardous Materials heretofore generated from the Property have been disposed of in accordance with all applicable laws; and (iii) neither Landlord nor Tenant is or would be liable under any Environmental Laws for any activities occurring with respect to the Property or the Premises prior to the Rent Commencement Date.   Should Landlord be notified that the Property does not comply with all Environmental Laws (except as the result of Tenant's violation of same), then ) andlord shall take immediate steps to correct any such violation or contamination.   Landlord shall pursue compliance with all Environmental Laws with reasonable diligence and if Landlord shall fail to do so then Tenant shall have the right, upon thirty (30) days written notice, to terminate this Lease and be relieved of all further liability hereunder.   Landlord shall defend, indemnify and hold harmless Tenant and its affiliates, subsidiaries, beneficiaries, agents and employees from and

27

**EXHIBIT A**

agents, all obligations, losses, claims, suits, judgments, liabilities, penalties, damages, costs and expenses, including reasonable attorneys' fees and consultants' fees and expenses, of any kind or nature whatsoever that may be incurred by, or asserted against Tenant due to Environmental Conditions (as hereinafter defined) of any kind not caused by Tenant or its agents, employees or contractors. The duties, obligations and liabilities of Landlord set forth in this Section 11.20 shall survive the expiration or sooner termination of this Lease.

(b) Without limiting, and in addition to, any other provisions of this Lease, Tenant hereby covenants and agrees that at all times during the Term of this Lease (and any renewal or extension thereof), Tenant shall not cause or allow the use, generation, manufacture, handling, treatment, presence, discharge, emission, disposal, transportation to storage of any Hazardous Materials in any portion of the Property by Tenant or its agents, contractors or employees; provided, however, Tenant shall be permitted without notice to or consent of Landlord to handle, store, use or dispose of products containing small quantities of Hazardous Materials (such as aerosol cans containing insecticides, toner for copiers, paints, paint remover, and the like) to the extent customary and necessary for Tenant's business and maintenance obligations under this Lease in a manner and location meeting all applicable Environmental Laws. Tenant (unless covenants and agrees that at all times during the Term of this Lease, Tenant shall comply with all applicable federal, state, local or other Environmental Laws, standards, rules, regulations, codes, ordinances, permits, licensing conditions, or court or administrative orders, now or hereafter in effect, regulating Tenant's occupation and/or operation and/or use of the Premises or any other portion of the Property. Tenant hereby agrees to defend, indemnify and hold Landlord, its officers, directors, employees and agents, and the Property harmless from any and all liabilities, obligations, charges, losses, damages, penalties, claims, demands, actions, suits, judgments, costs, expenses and disbursements incurred by Landlord, or asserted against Landlord or the Property, by any other party or parties (including, without limitation, any governmental entity) by reason of any Environmental Condition to the extent resulting from Tenant's occupation, use and/or operation of the Premises. Notwithstanding anything in this Lease to the contrary, in no event shall Tenant be liable to Landlord, and in no event, shall Tenant's obligations (including without limitation indemnification obligations) under this Lease extend to, Environmental Conditions of any kind (i) not caused by Tenant or its agents, employees or contractors, (ii) caused by Landlord or its agents, contractors or employees or (iii) existing on or prior to the date Landlord delivers possession of the Premises to Tenant. The duties, obligations and liabilities of Landlord set forth in this Section 11.20 shall survive the expiration or sooner termination of this Lease.

(c) As used herein, the term "Environmental Condition" shall mean or refer to any condition that may exist at any time during, or after the Term of this Lease (and any renewal or extension thereof) with respect to any gasoline releases, leakages, surface or subsurface contamination or pollution of the Property by any petroleum or petroleum products, or constituents, pollutants, dangerous substances, toxic substances, hazardous wastes, hazardous materials or hazardous substances, or any other substance (herein "Hazardous Materials") that is now or hereafter prohibited, restricted or regulated by federal, state or local laws, code, statute, or regulation, including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. sec. 9601 et. seq.), the Resource Conservation and Recovery Act (42 U.S.C. 6901 et. seq.), the Toxic Substance Control Act (15

EXHIBIT A

(U.S.C. 2601, et. seq.) and the Water Pollution Control Act (33 U.S.C. 1317, et seq.) (collectively, the "Environmental Laws"). Landlord represents and warrants to Tenant that, to the best of Landlord's knowledge, no Hazardous Materials have been generated, stored or disposed of on the Premises or the Property in violation of applicable laws. Landlord shall comply with, and shall pay all costs incurred in complying with, any Environmental Laws then in effect, including the performance of and payment for any environmental cleanup work and the preparation of any closure or other required plans, excluding, however, any costs related to Hazardous Materials on the Property established to have been caused directly by Tenant's use of the Property.

Section 11.21. Interest Rate. References in this Lease to the "Interest Rate" shall mean a rate of interest per annum equal to the lesser of (a) four percent (4%) above the prime rate of interest (as published in *The Wall Street Journal*, or, in the event *The Wall Street Journal* no longer publishes the prime rate of interest, the prime interest rate as published by an alternative national publication mutually agreed upon by the parties) determined as of the date any Rent or other charge under this Lease is due and for which interest at the Interest Rate is charged, or (b) the maximum rate allowed under the circumstances by applicable law.

Section 11.22. Broker. Landlord and Tenant represent and warrant to each other that each has incurred no liabilities or claims for brokerage commissions or finder's fees in connection with the execution of this Lease and that it has not dealt with, nor has knowledge of any broker, agent or salesperson in connection with this Lease except Sullivan Hayes and Western Retail Advisors, which are representing Tenant in this transaction (individually and collectively, "Broker"). Landlord shall be responsible for and shall pay the real estate commission due to Broker in accordance with the terms set forth in a separate agreement entered into between Landlord and Broker and shall hold Tenant harmless from the payment of same.

Section 11.23. Waiver of Landlord's Lien. LANDLORD HEREBY EXPRESSLY WAIVES ANY LIEN AND SECURITY INTEREST, WHETHER STATUTORY, COMMON LAW OR OTHERWISE, IN AND TO ALL OF TENANT'S PROPERTY. Tenant may assign, hypothecate, encumber, mortgage or create a security interest in or upon Tenant's Property in the Premises without notice to or the consent of Landlord and may remove Tenant's Property at any time during the Term. Landlord shall provide to Tenant, within twenty (20) days after Tenant's request therefor, a written waiver in form reasonably satisfactory to Tenant and Landlord evidencing Landlord's waiver of any rights it has or may have in Tenant's Property.

Section 11.24. Tenant Improvement Allowance. Landlord shall pay Tenant, within fifteen (15) days following receipt of a written invoice from Tenant, the sum of Twenty and No/100 Dollars ($20.00) per square foot of gross leasable floor area in the Premises (the "Tenant Improvement Allowance") upon the occurrence of both (a) the completion of all of Tenant's Work in the Premises in accordance with this Lease and (b) receipt from Tenant of lien waivers from all contractors performing Tenant's Work in the Premises. The Tenant Improvement Allowance payable to Tenant hereunder shall not be increased because of increases in the price of any labor, material or services.

Section 11.25. Intentionally Deleted.

**EXHIBIT A**

**Section 11.26. Parking Spaces.** Tenant shall have the exclusive right to use all parking spaces on the Property. Tenant shall, at its sole option, have the right to tow any unauthorized vehicles from the Property away at the owner's expense.

**Section 11.27. Intentionally Omitted.**

**Section 11.28. Execution and Delivery.** In the event Landlord does not execute and deliver this Lease to Tenant within thirty (30) days of Landlord's receipt of an executed counterpart of this Lease from Tenant, this Lease shall automatically terminate, be deemed null and void and of no further force or effect. This Lease may be executed in counterparts, each of which shall constitute an original, and which together shall constitute one and the same agreement. This Lease may be executed or delivered by electronic or facsimile means, and copies of executed signature pages stored electronically in portable document format (.pdf) shall be binding as originals.

**Section 11.29. Landlord's Representations and Warranties.** To induce Tenant to execute this Lease, and in consideration thereof, Landlord covenants, warrants and represents, as of the Effective Date, to Tenant as follows:

(a)     Landlord has, and as of the Turn Over Date Landlord shall have, good and marketable fee simple title to the Property, free and clear of all easements, restrictions, liens, encumbrances, leases and the like that are inconsistent with and prohibit any rights of Tenant under this Lease, and free and clear of all third party purchase rights that are not expressly subject to this Lease;

(b)     The Property is subject to no Mortgages as of the Effective Date, other than the following ("none" if left blank): _____;

(c)     No third party consents or approvals are required in order for Landlord to enter into this Lease, or for the performance of Landlord's Work and Tenant's Work (excluding governmental permits and approvals as described herein);

(d)     This Lease does not, to Landlord's knowledge, violate the provisions of any instrument heretofore executed by Landlord and/or binding on Landlord, or affecting or encumbering the Property or the Premises;

(e)     There, to Landlord's knowledge, are no restrictions or other legal impediments imposed by any public or private instrument or applicable zoning which would prevent: (i) the use of the Premises for the Permitted Use; (ii) the use of the Exterior Areas in the manner contemplated by this Lease; or (iii) the performance of Tenant's Work; and

(f)     To the best of Landlord's knowledge as of the Effective Date, no officer, director, employee or consultant of Tenant has received, or will receive, compensation, remuneration, fee or award, monetary or otherwise (other than a commercially reasonable commission to Broker), direct or indirect, from Landlord, or any person, trust, corporation, partnership, venture or other entity which, directly or indirectly, controls, or is controlled by Landlord, or is controlled by the same entity having a controlling interest in Landlord, on account of Tenant's execution of, payment of Rent under, or for any other cause or reason relating to, this Lease. In the event of any material misrepresentation by Landlord under this Section 11.29(f),

**EXHIBIT A**

Landlord shall be liable to Tenant for all costs and damages incurred by Tenant by reason of said material misrepresentations.

Notwithstanding anything to the contrary in this Lease, if any law, code, ordinance, regulation, restriction, lien, encumbrance, lease, instrument, or rights, public or private, including applicable zoning or rights belonging to a third party lessee of the Property or any adjacent property, or the need for any third party consent or approval pursuant thereto or for any rezoning, change in use approval, special or conditional use permit, variance or the like (collectively, "Restrictions"), precludes Tenant from obtaining Tenant's Permits, from performing Tenant's Work, from installing Tenant's Signage, or from using the Premises for the Principal Use without violating such Restriction or so precludes Tenant unless Tenant agrees to or accepts conditions Tenant deems unacceptable, then Tenant may terminate this Lease upon or after discovery thereof.

Section 11.30.   Anti-Terrorism Laws.  Landlord and Tenant each represent to the other that neither they nor any of their affiliates, and none of their respective employees, officers, directors, representatives or agents, is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Assets Control ("OFAC") (including those named on OFAC's Specialty Designated and Blocked Persons List) or under any statute, executive order (including the September 24, 2011 Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action

Section 11.31.   Time of the Essence.  Time is of the essence in this Lease.

[Signature Page to Follow]

51

**EXHIBIT A**

IN WITNESS WHEREOF, Landlord and Tenant have duly executed this Lease as of the day and year first above written.

WITNESS:

_____

Brenda Sharon

LANDLORD:

CROWN POINT RC, LLC,
an Arizona limited liability company

By: _____
Name: _____ ADAM SHARON
Title: _____ Manager

WITNESS:

Valerie Valon

Alexandra Arzola

TENANT:

MATTRESS FIRM, INC.,
a Delaware corporation

By: _____
Name: _____
Its: _____ CEO

32

**EXHIBIT A**

EXHIBIT "A"

LEGAL DESCRIPTION OF PROPERTY

LOT 2, CROWN POINT F-1, 24TH AMENDMENT, BEING A REPLAT OF LOT 3, CROWN POINT F-1, 6TH AMENDMENT, TOWN OF PARKER, COUNTY OF DOUGLAS, STATE OF COLORADO.

**EXHIBIT A**

EXHIBIT "B"

SITE PLAN

Property



**EXHIBIT A**

Access Drive



**EXHIBIT A**

## EXHIBIT "C-1"

## LANDLORD'S PLANS – SHEET INDEX

| SHEET INDEX | | | | |
|---|---|---|---|---|
| SHEET NUMBER | SHEET NAME | REV. | DATE | DESCRIPTION |
| 1  ARCHITECTURAL | | | | |
| A0.0 | PROJECT DATA | 1 | 6/5/17 | REVISION 1 |
| A0.1 | SITE PLAN / LIFE SAFETY | 1 | 6/5/17 | REVISION 1 |
| A1.0 | ROOF PLAN | 1 | 6/5/17 | REVISION 1 |
| A2.0 | FIRST FLOOR PLAN | | | |
| A3.0 | ELEVATIONS | | | |
| A3.1 | ELEVATIONS | | | |
| A4.0 | BUILDING SECTIONS | | | |
| A4.1 | WALL SECTIONS | 1 | 6/5/17 | REVISION 1 |
| A4.2 | WALL SECTIONS | 1 | 6/5/17 | REVISION 1 |
| A4.3 | DETAILS | | | |
| A5.0 | ENLARGED PLANS | | | |
| A5.1 | ENLARGED PLANS | | | |
| A6.0 | REFLECTED CEILING PLAN | 1 | 6/5/17 | REVISION 1 |
| A7.0 | SCHEDULES | | | |
| | | | | |
| 2  STRUCTURAL | | | | |
| S1 | FOUNDATION PLAN | | | |
| S2 | ROOF FRAMING PLAN | | | |
| S3 | SECTIONS | | | |
| S4 | SECTIONS | | | |
| S5 | SECTIONS | | | |
| | | | | |
| 3  MECHANICAL | | | | |
| MP0.0 | MECH. GENERAL LEGEND AND SHEET LOG | | | |
| MP1.0 | MECHANICAL PLAN | | | |
| MP2.0 | EQUIPMENT LIST AND DETAILS | | | |
| | | | | |
| 4  ELECTRICAL | | | | |
| E1.0 | ELEC. POWER & SPECS | 1 | 6/5/17 | REVISION 1 |
| E2.0 | ELEC. SITE PLAN | 1 | 6/5/17 | REVISION 1 |
| E3.0 | ONE-LINE/SCHEDULES | 1 | 6/5/17 | REVISION 1 |

## EXHIBIT A

EXHIBIT "C-2"

## CONSTRUCTION EXHIBIT - TENANT'S IMPROVEMENTS

Tenant shall be entitled to install Tenant's prototypical improvements in the Premises so long as the same are in compliance with all applicable laws.

EXHIBIT A

# EXHIBIT "D"

## TENANT ESTOPPEL CERTIFICATE

THIS ESTOPPEL CERTIFICATE is made as of the ____ day of _____, 20___, in connection with that certain Tenant Lease dated _____, 20___ (the "Lease"), between CROWN POINT RC, LLC, an Arizona limited liability company ("Landlord"), and MATTRESS FIRM, INC., a Delaware corporation ("Tenant"), for approximately ____ square feet of retail space identified on the site plan attached thereto (the "Premises").

The undersigned Tenant under the Lease, certifies to Landlord and _____ _____ (Mortgage Holder or Purchaser) and to their respective successors and assigns that, the Lease is presently in full force and effect and unmodified except as indicated herein; the Term thereof has commenced, and the full rental is now accruing thereunder; Tenant has accepted possession of the Premises, is currently operating its business therein and any improvements required under the terms of the Lease to be made by Landlord have been completed to the satisfaction of Tenant; no rent under the Lease has been paid more than thirty (30) days in advance of the due date; the address for notice is to be sent to Tenant as is set forth in the Lease; and Tenant as of this date, to its actual present knowledge, has no charge, lien, claim or offset under the Lease, or otherwise, against rents or other charges due or to become due thereunder, except _____

Tenant further certifies that the Term of the Lease commenced on the ____ day of _____, 20___.

MATTRESS FIRM, INC.,
a Delaware corporation

By: _____
Name: _____
Title: _____

**EXHIBIT A**

EXHIBIT "E"

PRE-APPROVED SIGNAGE

[ATTACHED]

**EXHIBIT A**



**EXHIBIT A**



**EXHIBIT A**



**EXHIBIT A**



**EXHIBIT A**



**EXHIBIT A**



**EXHIBIT A**



**EXHIBIT A**



**EXHIBIT A**



Sign Layout Detail



**EXHIBIT A**

## EXHIBIT "F"

## CONFIRMATION OF COMMENCEMENT DATE

THIS CONFIRMATION AGREEMENT is made and agreed upon as of this _____ day of _____, 20____, by and between CROWN POINT RC, LLC, an Arizona limited liability company (the "Landlord"), and MATTRESS FIRM, INC., a Delaware corporation (the "Tenant").

## WITNESSETH:

Landlord and Tenant have previously entered into a certain lease agreement dated _____, 20____ (the "Lease"), covering certain premises located at _____ as more particularly described in the Lease (the "Premises").

NOW, THEREFORE, in connection with the foregoing, the parties hereto mutually agree as follows:

1. For the purpose of confirming the establishment of the Rent Commencement Date, as required by the provisions of the Lease, Landlord and Tenant hereby agree that:

a. The date of _____, 20____, is hereby established as the "Turn Over Date" referred to in the Lease;

b. The date of _____, 20____, is hereby established as the "Rent Commencement Date" referred to in the Lease, upon which Rent and all other items of payment commence to accrue;

c. The date of _____, 20____, is hereby established as the scheduled expiration date of the initial term of the Lease; and

d. The gross leasable floor area of the Premises is _____ (____) square feet.

2. This Confirmation Agreement and each and all provisions hereof shall inure to the benefit of, or bind, as the case may require, the parties hereto and their respective heirs, successors and assigns.

IN WITNESS WHEREOF, the parties hereto have executed this instrument as of the date and year first written above.

Tenant                                        Landlord:


By:_____            By:_____


**EXHIBIT A**

EXHIBIT "I"
SNDA

RECORDING REQUESTED BY, AND
WHEN RECORDED RETURN TO:

Mattress Firm, Inc.
10201 South Main Street
Houston, Texas 77025
Attention: Real Estate Department

## SUBORDINATION, NON-DISTURBANCE
## AND ATTORNMENT AGREEMENT

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT ("Agreement") is made and entered into as of the ____ day of _____, 20___, by and among _____ (the "Lender"), ____ _____ (the "Tenant") and _____ (the "Landlord"), with reference to the following facts:

Landlord is the fee simple owner of those certain lots, tracts or parcels of land located in _____, legally described on Exhibit "A" attached hereto (collectively, the "Shopping Center").

Lender has made or is about to make a loan to Landlord in the original principal amount of _____ Dollars ($_____) (the "Loan").

To secure the Loan, Landlord has encumbered or intends to encumber the Shopping Center by entering into [a mortgage] that certain mortgage dated _____, 201_ [in favor of Lender (as amended, renewed, extended, spread, consolidated, severed, restated, or otherwise changed from time to time, the "Mortgage") [recorded on _____ in Volume _____, Page _____ in the Office of the Clerk in and for _____.]

Pursuant to that certain Lease Agreement effective as of _____, 201_ (the "Lease"), Landlord demised to Tenant a retail premises within the Shopping Center consisting of approximately ____ leasable square feet of space (the "Premises").

Tenant and Lender desire to agree upon the relative priorities of their interests in the Premises and their rights and obligations if certain events occur.

NOW, THEREFORE, for good and sufficient consideration, and intending to be legally bound, Tenant, Lender and Landlord hereby agree as follows:

1    Definitions. The following terms shall have the following meanings for purposes

i

## EXHIBIT A

Landlord or prosecuting such rights and remedies. In the latter case, Lender may join Tenant as a defendant in such action only for such purpose and not to terminate the Lease, pursue remedies against Tenant or otherwise adversely affect Tenant's rights under the Lease or this Agreement in such action.

3.2   **Non-disturbance and Attornment**.   If an Event of Default by Tenant of its obligation to pay Rent is not in existence, then, when Successor Landlord takes title to Shopping Center: (a) Successor Landlord shall not terminate or disturb Tenant's possession of the Premises under the Lease, except in strict accordance with the terms of the Lease and this Agreement; (b) Successor Landlord shall be bound to Tenant under all the terms and conditions of the Lease (except as provided in this Agreement); (c) Tenant shall recognize and attorn to Successor Landlord as Tenant's direct landlord under the Lease as affected by this Agreement; and (d) the Lease shall continue in full force and effect as a direct lease, in accordance with its terms (except as provided in this Agreement), between Successor Landlord and Tenant. Subject to the terms of the Lease, Tenant agrees to continue making payments of Rents and other amounts owed by Tenant under the Lease to the Landlord and to otherwise recognize the rights of Landlord under the Lease until notified otherwise in writing by Lender (as provided in the Mortgage), and after receipt of such notice the Tenant agrees thereafter to make all such payments to Lender, without any further inquiry on the part of the Tenant. Landlord agrees that Tenant may rely upon such notice and upon Tenant's receipt thereof. Landlord consents to Tenant making such payments directly to Lender, all such amounts being deemed paid in satisfaction of Tenant's corresponding obligations under the Lease.

3.3   **Further Documentation**.   The provisions of this Article 3 shall be effective and self-operative without any need for Successor Landlord or Tenant to execute any further documents. Tenant and Successor Landlord shall, however, confirm the provisions of this Article 3 in writing upon the written request by either of them.

4.   **Protection of Successor Landlord**.   Notwithstanding anything to the contrary in the Lease or the Mortgage, Successor Landlord shall not be liable for or bound by any of the following matters:

4.1   **Claims Against Former Landlord**.   Any Offset Right that Tenant may have against any Former Landlord relating to any event or occurrence before the date of attornment, including any claim for damages of any kind whatsoever as the result of any breach by Former Landlord that occurred before the date of attornment; provided, however, the foregoing shall not limit or preclude either: (a) Tenant's right to exercise against Successor Landlord any Offset Right otherwise available to Tenant because of: (i) breaches, defaults or events which first occurred before the date of attornment but are of a continuing nature, or (ii) breaches, defaults or events occurring after the date of attornment, or (b) Successor Landlord's obligation to correct any conditions that existed as of the date of attornment and violate Successor Landlord's obligations as landlord under the Lease.

4.2   **Prepayments**.   Any payment of Rent that Tenant may have made to Former Landlord more than thirty (30) days before the date such Rent was first due and payable under the Lease with respect to any period after the date of attornment other than, and only to the extent that, the Lease expressly required such a prepayment.

3

**EXHIBIT A**

4.3  **Payment**.  Any obligation: (a) to pay Tenant any sum(s) that any Former Landlord owed to Tenant; or (b) to restore improvements following a casualty not required to be insured against under the Lease.  This paragraph is not intended to apply to the following Landlord obligations, all of which Successor Landlord shall be liable for or bound to perform:  (i) performing the Landlord's Work, including without limitation construction of the Property, improvements to the Premises and expansions thereof as contemplated by the Lease, (ii) making any payment to Tenant that constitutes a construction or other type of allowance under the Lease; (iii) reconstructing or repairing the Property, including the Premises, following fire, casualty or condemnation; (iv) performing day-to-day maintenance, repairs and replacements of the Exterior Areas, to the extent required of the Landlord under the Lease; (v) repayment of any security deposit paid by Tenant to Landlord, if any; and (vi) repayment of any overpayment of Real Estate Taxes or Insurance Charges.

4.4  **Modification, Amendment**.  Any modification or amendment of the Lease made without Lender's written consent (such consent not to be unreasonably withheld, delayed or conditioned), which shall be deemed given by Lender if Lender fails to object to the same within five (5) business days following the date on which Lender receives from Landlord or Tenant a written request for such consent.

5.  **Exculpation of Successor Landlord**.  Notwithstanding anything to the contrary in this Agreement or the Lease, upon any attornment pursuant to this Agreement, the Lease shall be deemed to have been automatically amended to provide that Successor Landlord's obligations and liability under the Lease shall never extend beyond (i) Successor Landlord's (or its successors' or assigns') interest, if any, in the Shopping Center and the rents and revenues deriving therefrom, including without limitation insurance and condemnation proceeds, (ii) Successor Landlord's interest in the Lease, and (iii) the proceeds from any sale, lease or other disposition of the Shopping Center (or any portion thereof) by Successor Landlord (collectively, "**Successor Landlord's Interest**").  Tenant shall look exclusively to Successor Landlord's Interest (or that of its successors and assigns) for payment or discharge of any obligations of Successor Landlord under the Lease as affected by this Agreement.  If Tenant obtains any money judgment against Successor Landlord with respect to the Lease or the relationship between Successor Landlord and Tenant, then Tenant shall look solely to Successor Landlord's Interest (or that of its successors and assigns) to collect such judgment.  Tenant shall not collect or attempt to collect any such judgment out of any other assets of Successor Landlord.

Notwithstanding any provision of the Lease, this Agreement or any other agreement between Landlord and Lender to the contrary, Lender, for itself and any Successor Landlord, hereby waives any and all contractual, statutory and common law lien rights which Lender or any Successor Landlord may have, if any, (whether directly or derivatively) relating to Tenant's personal property, including without limitation Tenant's inventory, trade fixtures, furnishings, furniture, equipment, machinery, and other personal property located at the Premises.  Landlord agrees to execute such written waiver and release of liens with respect to said items as Tenant may reasonably require.

6.  **Lender's Right to Cure**.  Notwithstanding anything to the contrary in the Lease or this Agreement, before exercising any Termination Right,

1

**EXHIBIT A**

6.1    **Notice to Lender**.  Tenant shall provide Lender with written notice of the breach or default by Landlord giving rise to a Termination Right (the "**Default Notice**") and, thereafter, the opportunity to cure such breach or default as provided for below.

6.2    **Lender's Cure Period**.  After Lender receives a Default Notice, Lender shall have a period of thirty (30) days in which to cure the breach or default by Landlord.  Lender shall have no obligation to cure (and shall have no liability or obligation for not curing) any breach or default by Landlord, except to the extent that Lender agrees or undertakes otherwise in writing.   In addition, as to any breach or default by Landlord the cure of which requires possession and control of the Shopping Center, provided only that Lender agrees by written notice to Tenant within thirty (30) days after receipt of the Default Notice to exercise reasonable efforts to cure or cause to be cured by a receiver such breach or default within the period permitted by this paragraph  Lender's cure period shall continue for such additional time (the "**Extended Cure Period**") as Lender may reasonably require (but in no event more than thirty (30) additional days) to either: (a) obtain possession and control of the Shopping Center and thereafter cure the breach or default with reasonable diligence and continuity; or (b) obtain the appointment of a receiver and give such receiver a reasonable period of time in which to cure the default.

7.    **Miscellaneous**.

7.1    **Notices**.  Any notice or request given or demand made under this Agreement by one party to the other shall be in writing, and shall be given or be served by hand delivered personal service, or by depositing the same with a nationally recognized overnight courier service or by deposit in the United States mail, postpaid, certified mail  and addressed to the party to be notified, with return receipt requested.  Notice deposited in the mail in the manner hereinabove described shall be effective upon receipt; however, delivery by overnight courier service shall be deemed effective on the next succeeding business day after it is so deposited.  For purposes of notice, the addresses of the parties shall, until changed as herein provided, be as follows:

If to Lender, at:

_____   ___

_____

_____ ___   _____

Attn:_____   _____

If to Landlord, at:

___   _____

_____

Attn:_____   ___   __

If to the Tenant, at:
        Mattress Firm, Inc  (Store #____   )
        10201 South Main Street
        Houston, Texas 77025
        Attention:  Real Estate Department

5

**EXHIBIT A**

7.2    **Successors and Assigns.**  This Agreement shall bind and benefit the parties, their successors and assigns, any Successor Landlord, and its successors and assigns.  If Lender assigns the Mortgage, then upon delivery to Tenant of written notice thereof accompanied by the assignee's written assumption of all obligations under this Agreement, all liability of the assignor shall terminate.

7.3    **Entire Agreement.**  This Agreement constitutes the entire agreement between Lender, Landlord and Tenant regarding the subordination of the Lease to the Mortgage and the rights and obligations of Tenant, Landlord and Lender as to the subject matter of this Agreement.

7.4    **Interaction with Lease and with Mortgage.**  If this Agreement conflicts with the Lease, then this Agreement shall govern as between the Landlord and Tenant and between the parties and any Successor Landlord, including upon any attornment pursuant to this Agreement. This Agreement supersedes, and constitutes full compliance with, any provisions in the Lease that provide for subordination of the Lease to, or for delivery of non-disturbance agreements by the holder of, the Mortgage.  Lender confirms that Lender has consented to Landlord's entering into the Lease.

7.5    **Interpretation; Governing Law.**  This Agreement shall be construed in accordance with the laws of the State of _____.  Any action brought to enforce or interpret this Agreement shall be brought in the court of appropriate jurisdiction in _____.  Should any provision of this Agreement require judicial interpretation, it is agreed that the court interpreting or considering same shall not apply the presumption that the terms hereof shall be more strictly construed against a party by reason of the rule or conclusion that a document should be construed more strictly against the party who itself or through its agent prepared the same.  It is agreed and stipulated that all parties hereto have participated equally in the preparation of this Agreement and that legal counsel was consulted by each responsible party before the execution of this Agreement.

7.6    **Amendments.**  This Agreement may be amended, discharged or terminated, or any of its provisions waived, only by a written instrument executed by the party to be charged.

7.7    **Due Authorization.**  Tenant represents to Lender and Landlord that it has full authority to enter into this Agreement, which has been duly authorized by all necessary actions. Lender represents to Tenant and Landlord that it has full authority to enter into this Agreement, which has been duly authorized by all necessary actions.  Landlord represents to Tenant and Lender that it has full authority to enter into this Agreement, which has been duly authorized by all necessary actions.

7.8    **Waiver.**  The failure of any party hereto in any one or more instances to insist upon the strict performance of any one or more of the agreements, terms, covenants, conditions or obligations of this Agreement, or to exercise any right, remedy or election herein contained, shall not be construed as a waiver or relinquishment of the right to insist upon such performance or exercise in the future, and such right shall continue and remain in full force and effect with respect to any subsequent breach, act or omission.

7.9    **Execution.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

6

**EXHIBIT A**

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

**EXHIBIT A**

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the day and year first above written.

| | LENDER: |
|---|---|
| | By:_____ |
| | By:_____<br>Name:_____<br>Title:_____ |
| | LANDLORD: _____, a _____ |
| | By:_____<br>Name:_____<br>Title:_____ |
| | TENANT: MATTRESS FIRM, INC., a Delaware corporation |
| | By:_____ |
| | By:_____<br>Name:_____<br>Title:_____ |

**EXHIBIT A**

## Acknowledgment of Lender

STATE OF_____)
                                                      ) §
COUNTY OF _____)

On this _____ day of _____, 20___, before me, the undersigned Notary Public in and for said County and State, personally appeared _____, as _____, of _____, who executed the foregoing instrument on behalf of said _____ for the purposes therein expressed. He/She is either ( ) personally known to me or ( ) has produced _____ as identification, and ( ) did or ( ) did not take an oath. In witness whereof, I have hereunto set my hand and official seal the day and year last above written.

(SEAL)

_____
Notary Public Signature
Printed/Typed Name:_____
My Commission Expires:_____
Commission Number:_____

## Acknowledgment By Tenant

STATE OF_____)
                                                      ) §
COUNTY OF _____)

On this _____ day of _____, 20___, before me, the undersigned Notary Public in and for said County and State, personally appeared _____, as _____, of MATTRESS FIRM, INC., a Delaware corporation, who executed the foregoing instrument on behalf of said corporation for the purposes therein expressed. He/She is either ( ) personally known to me or ( ) has produced _____ as identification, and ( ) did or ( ) did not take an oath. In witness whereof, I have hereunto set my hand and official seal the day and year last above written.

(SEAL)

_____
Notary Public Signature
Printed/Typed Name:_____
My Commission Expires:_____
Commission Number:_____

11

**EXHIBIT A**

## Acknowledgment of Landlord

STATE OF _____ )
                                              ) S
COUNTY OF _____ )

On this _____ day of _____, 20___, before me, the undersigned Notary Public in and for said County and State, personally appeared _____; as _____ of _____, a _____, who executed the foregoing instrument on behalf of said _____ for the purposes therein expressed. He/She is either ( ) personally known to me or ( ) has produced _____ as identification, and ( ) did or ( ) did not take an oath. In witness whereof, I have hereunto set my hand and official seal the day and year last above written.

(SEAL)

_____
Notary Public Signature

Printed/Typed Name:_____
My Commission Expires:_____
Commission Number:_____

16

**EXHIBIT A**

Exhibit "A" to Non-Disturbance Agreement

(Legal Description of Shopping Center)

16

**EXHIBIT A**

DATE FILED: June 2, 2020 3:19 PM
FILING ID: 5C6353F238B1E
CASE NUMBER: 2020CV30425

# DEMAND FOR PAYMENT OF RENT OR POSSESSION OF PREMISES

TO:    Mattress Firm, Inc.
        18220 Cottonwood Drive
        Parker, CO 80138

and all other persons occupying such premises.

You are hereby notified by the undersigned as owner or agent of the owner that the sum of $41,465.69 is past due and unpaid under the terms of your Lease dated April 2, 2018, as amended, for the above referenced Premises which you occupy as Tenant.  Such sum represents: (i) short-falls for Base Rent, CAM, and other charges under the Lease; (ii) real estate taxes; and (iii) late fees of $2,000.00.  Additionally, the landscaping at the Premises is in need of immediate care.  As a result of the foregoing, you are in default under the terms of your Lease.

Demand is hereby made upon you that you pay said rent and/or expenses and cure the other defaults within three (3) days from the service of this Demand, or quit and deliver up to the undersigned possession of said Premises, and by failing to do so, you will be guilty of an unlawful detention of said Premises contrary to the statutes of the State of Colorado.  Delivery of possession of the Premises will in no manner relieve you from your liability for payment of rent and expenses covering the balance of the period of your Lease.  By the service of this Notice, the undersigned as owner or as agent for the owner is not accepting surrender of the Premises and is in no way manifesting intent to terminate the Lease on said Premises.  As provided for in the Lease, the owner and its agent reserves the right to reenter, retake possession and relet the Premises without thereby terminating your obligation as Tenant thereunder.

The Base Rent for said premises is $11,064.33 per month.

DATED this 13th day of May, 2020.

                                **OWNER:**

                                **BOULDER REAL ESTATE COMPANY, LLC**

                                By_____
                                      Douglas S. Antonoff
                                      Manager

**EXHIBIT B**

**Landlord**

**BOULDER REAL ESTATE COMPANY, LLC**

v.

**Tenant**

**MATTRESS FIRM, INC.**

**Affidavit of Service**
DATE FILED: June 2, 2020 3:19 PM
FILING ID: 5C6353F238B1E
CASE NUMBER: 2020CV30425

**Recieved on May 13, 2020 at 5:08 pm**

I, Steven D. Glenn, being duly sworn, depose and say, I have been duly authorized to make service of the document(s) listed herein, in the above mentioned case. I am over the age of 18, and am not a party to or otherwise interested in this matter.

**On May 14, 2020 at 2:51 pm, I executed service of a DEMAND FOR PAYMENT OF RENT OR POSSESSION OF PREMISES; ATTACHMENT, on MATTRESS FIRM, INC. at 18220 Cottonwood Drive, Parker, Douglas County, CO 80138.**

**By Posted Service: MATTRESS FIRM, INC.**

**Additional Comments: I posted documents on front door.**

**I declare under penalty of perjury under the laws of the State of Colorado that the foregoing is true and correct.**

**Executed on May 15, 2020 at Greenwood Village, Colorado**

Steven D. Glenn

Field Sheet Id: 3205
Client Reference    Mattress Firm, Inc v. Boulder Real Estate Company, LLC

Page 1 of 1
Process ServerSoftware Pro

**EXHIBIT C**

**INVOICE # 2653**

**Issue Date:** 05/15/2020
**Terms:** Net 15 Days
**Due Date:** 05/15/2020

**Magnum-Diego Priority Services**
8480 E. Orchard Road, Suite 5700
Greenwood Village, CO  80111

**Bill To:**  **Boulder Real Estate Company, LLC**
**Attn: Douglas Antonoff**
**1528 Wazee Street**
**Denver, CO 80202**

**Client Reference**

Mattress Firm, Inc v. Boulder Real Estate

| Field Sheet ID:  3205 | | Service To:  MATTRESS FIRM, INC. | | |
|---|---|---|---|---|
| Qty | Item Code | Description | Fee | Total Fee |
| 1.00 | SFP | Service Fee - Parker | $86.00 | $86.00 |
| Location: | 18220 Cottonwood Drive, Parker, Douglas County, CO 80138 | | | |

| | |
|---|---|
| **Field Sheet Total:** | **$86.00** |

| | |
|---|---|
| **Invoice Total:** | $86.00 |
| **Payments:** | $0.00 |
| **Outstanding Balance:** | $86.00 |

**\*\*Please reference the invoice number on all payments\*\***

**Thank you and we appreciate your business!**

Page 1 of 1

Process Server Software Pro

**EXHIBIT C**

| DISTRICT COURT,  DOUGLAS COUNTY, STATE OF COLORADO<br>Court Address:<br>4000 Justice Way<br>Castle Rock, CO 80109 | DATE FILED: June 2, 2020 3:19 PM<br>FILING ID: 5C6353F238B1E<br>CASE NUMBER: 2020CV30425 |
|---|---|
| **Plaintiff:**<br><br>BOULDER REAL ESTATE COMPANY, LLC, a Colorado limited liability company<br><br>v.<br><br>**Defendant:**<br><br>MATTRESS FIRM, INC., a Delaware corporation | ▲ COURT USE ONLY ▲ |
| **Attorneys for Plaintiff:**<br>Attorney:      Alan D. Sweetbaum, #13491<br><br>Name:         Sweetbaum Sands Anderson PC<br>Address:      1125 17th Street, Suite 2100<br>                   Denver, Colorado 80202<br>Phone No.:   (303) 296-3377<br>Fax No.:       (303) 296-7343<br>E-mail:        asweetbaum@sweetbaumsands.com | |
| **DISTRICT COURT CIVIL (CV) CASE COVER SHEET FOR INITIAL PLEADING OF COMPLAINT,<br>COUNTERCLAIM, CROSS-CLAIM OR THIRD PARTY COMPLAINT<br>AND JURY DEMAND** | |

1.  This cover sheet shall be filed with the initial pleading of a complaint, counterclaim, cross-claim or third party complaint in every district court civil (CV) case. It shall not be filed in Domestic Relations (DR), Probate (PR), Water (CW), Juvenile (JA, JR, JD, JV), or Mental Health (MH) cases. Failure to file this cover sheet is not a jurisdictional defect in the pleading but may result in a clerk's show cause order requiring its filing.

2.  Simplified Procedure under C.R.C.P. 16.1 **applies** to this case **unless** (check one box below if this party asserts that C.R.C.P. 16.1 **does not** apply):

■ This is a class action, forcible entry and detainer, Rule 106, Rule 120, or other similar expedited proceeding, **or**

☐ This party is seeking a monetary judgment against another party for more than $100,000.00, including any penalties or punitive damages, but excluding attorney fees, interest and costs, as supported by the following certification:

> By my signature below and in compliance with C.R.C.P. 11, based upon information reasonably available to me at this time, I certify that the value of this party's claims against one of the other parties is reasonably believed to exceed $100,000."

**Or**

☐ Another party has previously filed a cover sheet stating that C.R.C.P. 16.1 does not apply to this case.

3. ☐ This party makes a **Jury Demand** at this time and pays the requisite fee. See C.R.C.P. 38. (Checking     this box is optional.)

**Date: June 2, 2020**          *S/Alan D. Sweetbaum*
                                        **Alan D. Sweetbaum**

**NOTICE**
This cover sheet must be served on all other parties along with the initial pleading of a complaint, counterclaim, cross-claim, or third party complaint.